David F. MALINSKI, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 64S00–0004–CR–287.

Supreme Court of Indiana.

Sept. 3, 2003.

Thomas M. Breen, Todd Selby Pugh, Thomas M. Breen & Assoc., Chicago, IL, John E. Martin, Tsoutsouris & Bertig Valparaiso, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General Indianapolis, IN, Attorneys for Appellee.

SHEPARD, Chief Justice.

A jury found David F. Malinski guilty of murdering Lori Kirkley, and likewise convicted him on associated counts of arson, auto theft, criminal confinement, criminal deviate conduct, and two counts of burglary.

In this direct appeal, Malinski contends that the police violated his right to counsel under the Indiana Constitution by not informing him that a lawyer hired by relatives was present at the police station and wished to see him. We agree that the police should have told him of counsel's presence, but conclude under the totality of the circumstances that this failure does not require reversal.

### Facts and Procedural History

Viewed favorably to the jury's verdict, the evidence revealed that on July 21, 1999, Lori Kirkley ("Lori") disappeared from her residence in Valparaiso, and has not been heard from or seen since. The previous day, July 20th one of the Kirk-

ley's neighbors saw someone on a bicycle raise the garage door of the Kirkley residence, enter, and leave about 15 minutes later. He could not tell if the person was male or female.

On the 21st, the same neighbor saw the bicyclist arrive, saw the garage door go up, and the person go inside; then the door closed. The neighbor subsequently saw Lori come home, go in and close the garage door. About twenty minutes later, the garage door rose and Lori's Explorer backed up and left leaving the garage open.

When Lori's husband Robert arrived home that night, the garage door was open, all the lights in the house were on, and there was a note taped to the wall in the kitchen that said, "There's a gun pointed at your head." (R. at 2576–77.) Lori's blood was found on a butter knife and on the kitchen floor. The bedroom had been ransacked and Lori's underwear drawer emptied. The police found an earring under the refrigerator, and a lens from one of Lori's newer pairs of glasses that popped out and was knocked under the oven. All the eyewear that she possessed in July 1999 was accounted for. None of her luggage was missing.

Lori had two significant medical conditions: she was an asthma patient, and she had her thyroid removed. She took medication for both conditions, but her medication was still in the residence. An FBI search for Lori determined that her prescriptions had not been refilled anywhere in the United States. According to Lori's pharmacist, records indicated that she was very consistent about taking her medicine on a daily basis. Nevertheless, there had been no request for transfer of Lori's prescription, as federal law would require if there were an attempt to fill the prescription somewhere else.

On July 23rd, a boy found a plastic bag next to the dumpster in his apartment complex; a note in the bag said: "Please give this letter to Mr. Kirkley [sic]. His wife is missing." (R. at 2260.) Inside the bag the police found a set of keys that belonged to Lori. The dumpster note was addressed to Mr. Kirkley and said, among other things, "I'm sorry about your wife. She wouldn't cooperate, even with a .44 Magnum pointed at her head." (R. at 2277.) The note also said, "I tackled her and attempted to cover her mouth. She bit the tip of my finger off" ... "I had no plans to kill her, but unfortunately I had to.... You will never find the body." *Id.* In the dumpster, police found one of Lori's biking shoes.

Malinksi and Lori knew each other as co-workers in the Cardiac Rehabilitation Center of Porter Memorial Hospital. Written text similar to that of the dumpster note resided in a computer near Malinski's desk in an office at his workplace. On July 24th, Lori's Ford Explorer was found completely burned in a cornfield, and numerous bullets were recovered from the floor of the Explorer.

At about 10 p.m. on July 27th, police officers in Griffith, Indiana, arrested Malinski in connection with Lori's disappearance. Porter County investigators arrived at the Griffith Police Department to interrogate him. On July 28th, Malinski agreed to give a recorded statement.

Before Malinski gave the statement, investigators read him an interrogation/advice of rights form in compliance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Malinski signed a *Miranda* waiver form. After acknowledging his signatures on the waiver, Malinski agreed to provide a recorded statement to the police without an attorney present. In his recorded statement, Malinski admitted committing the February

2nd burglary of the Kirkley residence, but he denied any knowledge of or involvement in Lori's disappearance.

At 6:50 a.m. on July 28th, at the Porter County Jail, Malinski agreed to give a second statement to agents of the Federal Bureau of Investigation. Malinski was again advised of his *Miranda* rights, and he further agreed to the questioning and to providing a statement, which was also recorded.

Malinski's second statement was inconsistent with his first. In the second statement, Malinski told the agents that he had been romantically involved with Lori, that she was unhappy in her marriage, and that he and Lori planned to run away together. He said Lori helped plan the February 2nd burglary and the burglary and disappearance on July 21st. Malinski stated that he had a change of heart and decided not to run away with Lori, and that Lori ran away on her own. At no point during the questionings did Malinski request the assistance of a lawyer.

At about 8:30 a.m. on the 28th, Malinski's wife and brother sought legal help for Malinski by meeting with local attorney John E. Martin. Martin arrived at the Porter County Jail around 9:45 a.m. and asked to speak with Malinski. He was first told that Malinski was not in the jail. Another officer also denied Martin access to Malinski informing Martin that Malinski was giving a statement to the FBI. Martin made two additional attempts to speak to Malinski, including speaking with the prosecuting attorney of Porter County. Martin was repeatedly denied access to Malinski and was informed that Malinski had waived his rights. Malinski was not informed that Martin was trying to reach him. Martin petitioned to the trial court for access to Malinski and for an end to the interrogation, but these requests were denied.

After charges were filed, Malinski sought to suppress his statements, claiming among other things that denying him access to his attorney violated his right to counsel under the Indiana Constitution, article I, section 13. The trial court denied the motion, finding that Malinksi was advised of his rights, acknowledged that he understood them, and freely and voluntarily spoke to the police. It also found that Malinski had not requested an attorney at any time.

The police observed injuries on Malinski's hand and body, which were photographed. Malinski's co-workers observed scratches and bruises on him in the days after Lori disappeared. Malinski told one person that his injuries were sustained helping his brother move some cabinets, but Malinski's brother testified that this was not true.

A forensic dentist examined Malinski and determined that an injury on the middle finger of the right hand was caused, to a reasonable medical certainty, by a human bite.

On July 28, the FBI recovered a document from the hard drive of a Macintosh computer in Malinski's residence, which reflected a detailed plan to burglarize the Kirkley house. The Macintosh note speaks of monitoring Lori's activities, arranging to take her garage door opener and the key to her house, surrepticiously, and learning to override the Kirkley's home security system. It also talks about alibis to use if Malinski becomes a suspect, the property he planned to take from the house, and planting evidence at the scene to mislead investigators. Personal property belonging to the Kirkleys was recovered from Malinski's attic.

While in jail, Malinski told a cellmate about some photographs he had taken of Lori and asked the cellmate, who expected

to get out of jail soon, to find the pictures and destroy them. The inmate told a jailer, who turned the information over to the investigators. On August 26, 1999, the police found several Polaroid photographs of a partially nude woman in bondage on the bed in Malinski's master bedroom. The police determined that the woman was Lori Kirkley. In some photos, a sexual device is inserted in her body.

On September 7, 1999, and November 2, 1999, the police gathered Malinski's personal property and placed it in a cardboard container for safekeeping while Malinski was in solitary confinement for disciplinary reasons. On both occasions investigators from the Porter County Sheriff's Department removed and photocopied a number of documents from Malinski's belongings. The original documents were returned to the cardboard container. The deputy prosecuting attorney was aware of these events.

When the criminal charges were filed, the court ordered the State to turn over to the defense the discovery as it was received on a weekly basis. On December 31, 1999, the deputy Prosecutor informed the defense of the photocopying that occurred during September and November and provided copies of the documents. Malinski moved to dismiss all charges or, in the alternative, to suppress all evidence illegally obtained and their fruits. He claimed that items the investigators copied were "legal documents" and that the seizure of such documents constituted a violation of Malinski's rights under the U.S. Constitution. The motion was denied.

A jury found Malinski guilty on all seven counts. The court ordered that the counts of burglary, murder, and criminal deviate conduct run consecutive to each other for a total of 125 years, and consecutive to a thirty-year sentence on the remaining

counts, for an aggregate sentence of 155 years in prison.

## I. Motion to Suppress: Right to Counsel

Malinski argues that the trial court erroneously denied his motion to suppress his statements because his right to counsel under Indiana Constitution, article I, section 13 was violated. He claims that the police had an affirmative duty to inform him that an attorney was present and actively trying to speak with him while he was being interrogated.

■ *A. Current Status of a Custodial Suspect's Right to be Informed About Attorney's Presence.* The Fifth and Fourteenth Amendments of the U.S. Constitution as well as article I, section 14 of the Indiana Constitution guarantee a defendant's right against self-incrimination. The amendments also afford the rights to remain silent and to be represented by an attorney. The Supreme Court held in *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that a defendant may waive these rights so long as the waiver is made "voluntarily, knowingly, and intelligently." In other words, there is a right not to be forced to speak, "but there is no right to bar a confession freely given after appropriate warnings and waivers." *Ajabu v. State,* 693 N.E.2d 921, 930 (Ind.1998).

In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court examined the validity of a defendant's waiver of his right to counsel under circumstances similar to those presented here. In *Burbine,* the defendant confessed to a murder after being informed of his *Miranda* rights. *Id.* at 415, 106 S.Ct. 1135. While he was in custody, the defendant's sister retained an attorney to represent him. *Id.* at 416, 106 S.Ct. 1135. The attorney telephoned the police station and was assured that all question-

ing would cease until the following morning. *Id.* Nevertheless, the police interrogated the defendant later that evening, and he confessed. *Id.* at 417.

The Court held that the waiver of *Miranda* rights was valid, despite the police failure to inform the defendant that his attorney tried to contact him and the false assurances that police gave the defendant's attorney. *Id.* at 423–24, 106 S.Ct. 1135. The Court concluded that neither the Fifth nor the Fourteenth Amendment guarantees of due process were violated. *Id.* at 419–20, 106 S.Ct. 1135.

Though federal law does not require that police inform a custodial suspect about an attorney's efforts to contact him, the *Burbine* Court observed that states have leeway to adopt different requirements for the conduct of their employees and officials as a matter of state law. *Id.* at 428, 106 S.Ct. 1135. Malinski thus urges us to hold that the Indiana Constitution was violated.

In *Ajabu v. State,* 693 N.E.2d 921 (Ind. 1998), we addressed this issue under state constitutional grounds. As in *Burbine,* the police in *Ajabu* did not inform a custodial suspect that an attorney, retained by the suspect's father, had called the police station and requested that the interrogation cease until the attorney could meet with his client. *Id.* at 926. The police told the lawyer that "the information would be passed along to the appropriate people." *Id.* The suspect later waived his *Miranda* rights and gave a full confession to the murder, without ever having been told of the attorney's call. *Id.*

Ajabu contended that his section 14 privilege against self-incrimination was violated because the police did not inform him of his attorney's efforts to speak to him before the interrogation took place. *Id.* at 927. We adopted the reasoning in *Burbine* and held that Indiana's privilege

against self-incrimination did not afford custodial suspects any more protection than the Fifth Amendment. *Id.* at 934–35. We held that a clear request for counsel is a prerequisite for invocation of the right under section 14. *Id.* at 935. A "suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Id.* at 933 (citing *Davis v. United States,* 512 U.S. 452, 460–61, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).

We addressed only obliquely the possible application of Indiana's section 13 right to counsel to the facts in *Ajabu* because *Ajabu* relied solely on section 14. *Ajabu,* 693 N.E.2d at 928. Malinski bases his claim directly on section 13's guarantee that an accused has the right "to be heard by himself and counsel" in all criminal prosecutions.

*B. Other State Approaches to the "Duty to Inform".* Several other state courts have construed similar constitutional provisions in considering a "duty to inform". Those courts that have recognized an affirmative duty to inform have often relied on a factual distinction: whether the attorney seeking access to his client is present at the police station where the suspect is being held, or whether the attorney is simply calling the station.

For instance, in *Dennis v. State,* 990 P.2d 277, 284 (Okla.Crim.App.1999), the court held that under state law a defendant cannot knowingly and intelligently waive his rights to counsel and against self-incrimination where he does not know that retained counsel is present and actively trying to consult with him. The court specifically distinguished between attempts to contact a client in person and attempts over the phone. *Id.* The court's holding applies only where an attorney is

present while a defendant is questioned and actively trying to see the defendant, who is not told the attorney is there. *Id.*[1]

Similarly, in *People v. Wright,* 441 Mich. 140, 490 N.W.2d 351, 357 (1992), the court believed "if the defendant knew that a retained attorney was waiting for him, he would not have waived his right to silence or to counsel." It held that under the Michigan Constitution a suspect has the right to be informed of retained counsel's in-person efforts to contact him in order for there to be a knowing and fully voluntary waiver of the suspect's Fifth Amendment rights. *Id.* at 356–57. To hold otherwise, it said, would suggest "that a State has a compelling interest, not simply in custodial interrogation, but in lawyer-free, incommunicado custodial interrogation." *Id.* at 357 (citing *Burbine,* 475 U.S. at 437, 106 S.Ct. 1135 (Stevens, J., dissenting)).[2]

In *State v. Stoddard,* 206 Conn. 157, 537 A.2d 446, 452 (1988), the court concluded that under the Connecticut due process and right to counsel clauses police must promptly inform a suspect of "timely efforts by counsel to render pertinent legal assistance." It noted Connecticut's history of recognizing the significance of the right to counsel. *Id.* The duty to inform, however, applied even when the attorney simply calls the police station. *Id.* at 454. The court reasoned that the police are not entitled to prevent a suspect from exercising the choice to which he is constitutionally

entitled by being dishonest with counsel or by keeping a suspect uninformed of counsel's efforts. *Id.* at 452.[3]

Besides urging that the Indiana right to counsel commands greater protection than the federal Bill of Rights, Malinski bases his claim on this same factual distinction. In *Burbine* and *Ajabu,* the attorney *telephoned* the station. Malinski's attorney was *present* at the station when he unsuccessfully made repeated attempts to reach him. (Appellant's Br. at 40.)

The State properly replies that an express request for counsel is required to trigger the Indiana constitutional right to counsel and preclude further questioning of the suspect in custody. (Appellee's Br. at 15); *see Ajabu,* 693 N.E.2d at 928, n. 4. Adopting the reasoning in *Burbine,* the State argues that the presence of the attorney at the station would not affect the constitutional result because such distinction would not change the reasoning that events occurring outside the presence of the suspect and unknown to him could not affect the validity of his waiver. (Appellee's Br. at 14.)

██ We have on other occasions concluded that section 13 affords Indiana's citizens greater protection than its federal counterpart. *Ajabu,* 693 N.E.2d at 929. Depending on the circumstances, the section 13 right to counsel, unlike the Sixth

---

1. *See also State v. Reed,* 133 N.J. 237, 627 A.2d 630 (1993) (when attorney is present or readily available to assist suspect, communication of that information to suspect is essential to making valid waiver); *People v. Bender,* 452 Mich. 594, 551 N.W.2d 71 (1996) (Michigan constitution requires police to inform suspect that retained attorney is immediately available to consult with him; duty to inform serves as an effective prophylactic rule protecting Michigan's constitutional privilege against self-incrimination and right to counsel).

2. *See also People v. McCauley,* 163 Ill.2d 414, 206 Ill.Dec. 671, 645 N.E.2d 923 (1994) (Illinois due process and right to counsel clauses violated where police refused to allow attorney to speak with client in custody or failed to inform suspect that his attorney was present).

3. *See also Haliburton v. State,* 514 So.2d 1088 (Fla.1987), *cert. denied* (failure to notify a suspect of attorney's calls and presence at the police station violates the due process clause of the Florida Constitution).

Amendment, attaches prior to the filing of formal charges against the accused. *Id.; Suter v. State*, 227 Ind. 648, 88 N.E.2d 386, 390 (1949); *see also Taylor v. State*, 689 N.E.2d 699, 703–04 (Ind.1997). Moreover, our precedents have often interpreted the section 13 right expansively. *See e.g., Bolkovac v. State*, 229 Ind. 294, 98 N.E.2d 250 (Ind.1951) (recognizing an unqualified right to counsel in both felony and misdemeanor cases under section 13).[4]

■ In light of Indiana's history of an expansive state right to counsel, we agree with Malinski that an incarcerated suspect has a right under section 13 to be informed that an attorney hired by his family to represent him is present at the station and wishes to speak to him. As we noted in *Ajabu*, most section 13 cases turn on whether the defendant made a clear request for counsel. When the case involves a claim that police continued to interrogate in the face of a request for counsel, that bright line is appropriate and we re-affirm it. Here the issue seems different: is the waiver of counsel knowing and intelligent when made in ignorance of the fact that a lawyer hired by the family is nearby and asking to see you? As put by the Illinois Supreme Court, "The day is long past ... where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door." *McCauley*, 206 Ill.Dec. 671, 645 N.E.2d at 929.

■ The Court in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda*, 384 U.S. at 436, 86 S.Ct. 1602, condemned the scenario where such practice is likely to result in an in-communicado interrogation and surrounding coercive environment.[5] "Just as the government cannot conceal from a suspect material and exculpatory evidence, so too the government cannot conceal from a suspect the material fact of his attorney's communication." *Burbine*, 475 U.S. at 467, 106 S.Ct. 1135 (Stevens, J., dissenting).

We hold that law enforcement officials have a duty to inform a custodial suspect immediately when an attorney hired by the suspect's family to represent him is present at the station seeking access to him.

*C. Effect of Failure to Inform.* Obviously, a suspect may waive his right to counsel and give a statement while in custody. Such a valid waiver must be voluntary and intelligent Thus, the question becomes whether withholding information about counsel's presence made the waiver invalid.

Courts faced with similar claims have adopted two different approaches. Some have employed a *per se* rule of exclusion in order to enforce the duty to inform. *See e.g., People v. Bender*, 452 Mich. 594, 551 N.W.2d 71, 80–81 (1996); *State v. Haynes*, 288 Or. 59, 602 P.2d 272, 278–79 (1979); *People v. Houston*, 42 Cal.3d 595, 230 Cal. Rptr. 141, 724 P.2d 1166, 1174–75 (1986). Other courts have adopted a totality of the circumstances approach. *See Stoddard*, 537 A.2d at 456; *Dennis*, 990 P.2d at 285; *People v. Wright*, 490 N.W.2d at 356.

The *Stoddard* court said that "reliance on the totality of the circumstances is con-

---

**4.** *See also Batchelor v. State*, 189 Ind. 69, 125 N.E. 773 (1920) (endorsing defendant's right to counsel in pretrial proceedings); *Speight v. State*, 239 Ind. 157, 155 N.E.2d 752 (1959) (right to counsel in juvenile cases).

**5.** *See Escobedo*, 378 U.S. at 487, 84 S.Ct. 1758 ("it 'would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State, to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police' "); *Miranda*, 384 U.S. at 457, 86 S.Ct. 1602 ("[t]his atmosphere carries its own badge of intimidation").

sistent with existing rules for the evaluation of the validity of a waiver." *Id.*, 537 A.2d at 456. In applying this test, it considered factors such as the extent to which the police had reasonable notice of counsel's request, conduct of the suspect, nature of counsel's request, and relationship of the suspect to the attorney. *Id.* The *Dennis* court used similar factors. *Dennis,* 990 P.2d at 284–85. We adopt a "totality of the circumstances" approach as articulated by the courts in *Stoddard* and *Dennis,* and turn to the case before us.

 Taken as a whole, the record suggests a voluntary and intelligent waiver. First, there is no indication that attorney Martin, retained by Malinski's family, had a previous relationship with Malinski himself. While hardly dispositive, this fact makes it seem less likely that Malinski would have responded to the lawyer's request than would be the case if the request came from someone he already knew.

Second, the police repeatedly read Malinski his rights and he consistently waived them and agreed to talk. Third, Malinski signed a written waiver of his *Miranda* rights. Indeed, before taking a second recorded statement, the FBI agents showed Malinksi his signed waiver and asked him once again whether he understood his rights. Malinski acknowledged his rights and signature on the waiver form, and again chose to provide a statement. Finally, at no time during the interrogations did Malinski request counsel, a fact more supportive of a knowing waiver than would be the case if the record reflected some indecision.

The record does not suggest any hesitation. In fact, Malinski provided two detailed statements of the events surrounding Lori's disappearance. Such detailed accounts demonstrate a willingness on Malinski's part to cooperate with law enforcement officers. The fact that neither statement constituted a confession further suggests the lack of any likely effect that contact with counsel would have had on Malinski's decision to talk. The only effect that resulted from the two statements Malinski provided was that of two inconsistent statements. In both statements he maintained his innocence.

Thus, numerous factors weigh in favor of finding a knowing, voluntary, and intelligent waiver. In light of all the circumstances, we conclude that Malinski's ignorance of Martin's presence did not convert his waiver into one that was involuntary. The trial court did not err in denying Malinski's motion to suppress his statements.

## II. Seizure of Documents in Jail

Malinski claims that the police violated his Sixth Amendment right to counsel by seizing from his jail cell documents he categorizes as confidential communications between him and his lawyer.

On September 7, 1999, and again on November 2, 1999, personal property from Malinski's cell was gathered and placed in a cardboard container for safe keeping while Malinski was put in solitary confinement for disciplinary reasons. On both occasions, detectives photocopied papers from these belongings. The deputy prosecutor was made aware that this had occurred, but Malinski's lawyers did not learn about it until January 3, 2000, when counsel received a letter from the deputy prosecutor apprising him of the copying.

Malinski moved to dismiss, alleging that the State interfered with his Sixth Amendment rights by surreptitiously copying his legal documents. The trial court observed that the detectives' actions were, to say the least, "suspicious," but found it unnecessary to address Malinski's constitutional claims despite a dispute about how the documents were packaged when copied.

Instead, the court found that the prosecution's actions amounted to "a blatant violation of the court's discovery order." (R. at 626.) It treated the matter as a discovery violation and proceeded to determine what sanction was appropriate.

After examining the documents, the court found that "while those documents contain some details of Defendant's defense that may not have been previously known by the State, they do not contain any major revelations of defense strategy from which the State would gain a significant advantage by having advance knowledge." *Id.* Consequently, it concluded the proper sanction was to prohibit the State from using any of the copied documents for any purpose whatsoever during the course of the trial, including cross-examination of Malinski if he chose to testify. *Id.*

While the trial court did not specifically address Malinski's Sixth Amendment claim, its factual conclusions support a similar outcome under the Sixth Amendment.

■■ There is no *per se* rule that every intrusion by the prosecution into the relationship between a criminal defendant and his attorney constitutes a Sixth Amendment violation. *Weatherford v. Bursey,* 429 U.S. 545, 550–51, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Rather, some showing of prejudice is a necessary element of a Sixth Amendment claim based on an invasion of the attorney-client relationship. *United States v. Chavez,* 902 F.2d 259, 267 (4th Cir.1990), citing *Weatherford,* 429 U.S. at 558, 97 S.Ct. 837. In cases of Sixth Amendment violations, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) (footnote omitted).

■ Malinski contends that he was prejudiced by the detectives' actions in photocopying his *legal* documents because the information contained in the documents led to the discovery of a hidden room (also called the "porn room") in the attic of his house and several Polaroid photos of Lori in bondage. He notes the prosecution used this evidence at trial and thus, gave them an advantage. We conclude that the trial court's sanction for discovery violation was adequate to shield Malinski from any prejudice.

There is dispute about how the documents were packaged, one that may reflect on whether they could be considered "legal" or not. Nevertheless, in reviewing the documents in question, we agree with the trial court's assessment that they would not have revealed anything major that would have given the prosecution a significant advantage in the investigation. We also agree with the State's contention that based on the evidence, the hidden room and the photographs could have been discovered by means other than the copied documents.

There is ample evidence suggesting the authorities would have discovered the hidden room without the information contained in the documents. For one thing, in his second statement to the police, Malinski told about the "porn room." (R. at 2537.) The police had a map drawn by Malinski indicating the location of it. (R. at 1851–53.) Malinski's wife told the authorities there was such a room covered with photographs. (R. at 1850–51.) Prior to September 7th, the police recovered from Malinski's house a letter that described a room with electricity, dry wall, carpeting, and air conditioning, which led them to believe that they had not yet discovered the hidden room. (R. at 1853.)

The police also had the transcript of a monitored telephone call Malinski made from jail to his brother on August 25th, in which the brother refers to the room. (R. at 1857.) They likewise had a September 3rd statement taken from an inmate who recited Malinski's description of a room with a floor and a dummy hallway with a hidden wall. (R. at 1866.)

As to the Polaroid photos, the police recovered them on August 26th before either of the document removal events. (R. at 1829–30.) The police recovered these based on information received from an inmate. Malinski told an inmate that he discarded some photographs alongside a county road and that the pictures would incriminate him if found. (R. at 1819, 1822.)

Malinski urges that there is evidence that the police rifled through and removed some of his documents prior to September 7th. He says this earlier intrusion came days before the prosecution's discovery of the photographs. Such evidence does not show, however, that this earlier intrusion led to the discovery of the photos. In fact, the testimony does not make any reference to the photographs: an inmate had seen jailers go into Malinski's cell after having been removed, and "proceeded on looking through his house and removed his paperwork then." (R. at 1614.) Another inmate who testified said he never saw the jailers looking through Malinski's "stuff." (R. at 1882.)

We conclude that the State did not gain any significant advantage from copying Malinski's documents. The trial court made sure that the documents themselves were not used at trial for any purpose and Malinski appears not to have suffered any other demonstrable prejudice.

The trial court's remedy seems to have innoculated Malinski from any governmental misconduct. Absent a demonstrable or substantial threat of prejudice on the criminal proceedings, there is no basis for imposing a new trial as a remedy.

### III. Character Evidence— Evidence Rule 404

Malinski insists that the court violated Indiana Evidence Rule 404(a)(2) by allowing the State to present evidence about Lori's good character. The State replies that the evidence in question is not character evidence at all.

Indiana Evidence Rule 404(a) provides that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion. . . ." An exception allows admission of "[e]vidence of a pertinent trait of character of the alleged victim of the crime offered by an accused, or by the prosecution to rebut the same. . . ." Evid. R. 404(a)(2).

 The present claim hinges on the definition of the terms "character" and "character evidence." "Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." *United States v. Matias*, 39 Fed. Appx. 550, 552 (9th Cir.2002) citing John W. Strong, *McCormick on Evidence* (5th ed.1999). " 'Character evidence' is evidence regarding someone's personality traits." *Black's Law Dictionary* 576 (7th ed.1999).

 The State called witnesses at trial who testified about Lori's church activities, good work ethic and ability, close relationships with family and friends, her "supportive" nature, and love for animals. They also testified about Lori's habit of picking out clothing for her husband, taking her parents out for Mother's Day and Father's Day, playing the piano, playing

with her dog, and not wanting to disturb a nest of bunnies in her yard.

Malinski claims that this was "character evidence" prohibited by Rule 404(a)(2). According to the State, the evidence was offered to rebut Malinski's claim that Lori was unhappy in her marriage, was engaged in a sexual relationship with Malinski, and planned to run away with him.

The theory of the defense was that Lori and Malinski were involved in a sexual relationship before she disappeared, and that they were planning to run away together. In Malinski's second statement to the police, he said he began to have doubts about the whole situation and then decided not to leave with her. He said Lori grew very angry at his decision so she left his house, purchased a car, returned to his house with the car and a map of the United States, declaring she was going to "just take off." He said he has not heard of or seen Lori since. Malinski claimed he loved his wife and that Lori was just a "sexual convenience." According to Malinski, Lori did not like her husband, where she lived, or her job. (R. at 959.)

Malinski and his lawyers have maintained a fairly consistent posture: he and Lori had an affair, planned to disappear together, and staged a burglary to make it appear as if Lori was abducted. This theory was advanced in Malinski's second statement to the police, opening statement, and pretrial pleadings like in his motion in limine.

We agree with the State that the evidence in question was offered to prove that, contrary to Malinski's assertions, Lori was happy in her marriage and in her relationship with her family. The evidence of her church activities was not prohibited character evidence either, but evidence of her ties in the community and the type of activities she engaged in with her husband. It served to rebut Malinski's theory that Lori was engaged in an adulterous relationship with him.[6]

We conclude that the evidence at issue here was not prohibited by Rule 404.

 Malinski also contends that the trial court erred in allowing the State to introduce evidence of Lori's credibility regarding the February 2nd burglary. He says this violated Evidence Rule 704(b) by introducing witness testimony about Lori's credibility.

The State called several witnesses to testify as to whether, in their opinion, Lori was genuinely upset by the February 2nd burglary. Rule 704(b) prohibits testimony about the truthfulness of a witness. Rule 704(b) does not apply because Lori was not a witness. Moreover, the witnesses were testifying about Lori's demeanor: she appeared upset. They did not offer any opinion about whether any particular statement of Lori was true or not. This claim is without merit.

### IV. Comments on Failure to Testify

Malinski alleges prosecutorial misconduct, saying that during final argument the prosecution made two improper comments on Malinski's failure to testify. Malinski further alleges that the comments had a prejudicial impact that was fundamental, warranting a new trial.

The first comment referred to a typed letter the police recovered from Malinski's residence that appeared to be from Lori to David. Prosecutor Douglas stated: "Folks, the defendant isn't going to tell

---

6. It is contradictory to say that evidence that Lori was unhappy in her marriage and surroundings does not raise character issues, but that evidence that she was happy does so. If it is true that Malinski's claims do not implicate Lori's character, then neither does the State's evidence.

you Lori wrote that letter. And you know she didn't write that letter because it's absolutely nonsense ..." (R. at 4918.) The second comment mentioned a broken camcorder taken in the February 2nd burglary of the Kirkley home. Deputy prosecutor Shellenbarger stated: "There's never been a really full explanation for what the motive of taking the property was in either of the defendant's statements, but if it was to raise money for them to run away together, it's absurd to steal a broken camcorder." (R. at 4920.)

■ Malinski did not object to either of these statements, and thus has not preserved any issue for appeal.

## V. Admission of Expert Testimony

Malinski contends that the testimony of Dr. Prahlow was inadmissible under Indiana Evidence Rule 702 because it did not meet the foundation requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Malinski further urges that *Daubert* should be applied in this case because the Supreme Court in *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), extended the *Daubert* principles to all types of expert testimony.

■ The Indiana Evidence Rules differ from the Federal rules in that, "[e]xpert scientific testimony is admissible only if the court is satisfied that the *scientific principles upon which the expert testimony rests are reliable.*" Ind. Evidence Rule 702(b) (emphasis added).[7] "Federal case law interpreting the Federal Rules of Evi-

dence is not binding upon the determination of state evidentiary law." *See McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997) (citing *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995)). "The concerns driving *Daubert* coincide with the express requirement of Indiana Rule of Evidence 702(b) that the trial court be satisfied of the reliability of the scientific principles involved." *Id.* When analyzing Indiana Evidence Rule 702(b), we find *Daubert* helpful, but not controlling. *Id.*

■ Reliability may be established by judicial notice or sufficient foundation to convince the trial court that the relevant scientific principles are reliable. *Id.* The trial court held a hearing to determine the admissibility of Dr. Prahlow's testimony, who intended to testify for the State regarding his opinion of Lori Kirkley's medical condition and degree of willingness in various Polaroid photographs of her in bondage. Dr. Prahlow had been a forensic pathologist for about four years. He testified that he deals with investigations of death that are sudden, unexpected, or unnatural and that a majority of his study and research is involved with autopsy.

Having reviewed the photographs, Dr. Prahlow testified that, based on his forensic training and the photographs taken as a whole, it was his opinion that Lori was an unwilling participant and that she was incapacitated, unresponsive or unconscious in many of the photos.

He noted handcuffs on the right wrist, and he also noted red lines, marks, and bruises on the right wrist that appeared to be contusions. In his opinion, such marks

---

**7.** Ind. Evidence Rule 702. Testimony by Experts:

 (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, train-

ing or education, may testify thereto in the form of an opinion or otherwise.

 (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

were consistent with somebody trying to get out of restraints. He had seen similar marks at the autopsy of individuals who struggled trying to get out of handcuffs, and on individuals who have been bound against their will and attempted to get out of ligatures.

Dr. Prahlow noted a contusion or bruise on Lori's lip, which he attributed to blunt force trauma, and an abrasion on the upper lip. He also noted a mark on the buttock, which appeared to be a bruise. In addition, he testified that a mark on the right thigh in one photograph corresponded to the location in another picture of two black hooks holding a strap around the thighs.

Dr. Prahlow also opined that the woman in one photograph is alive because her left hand has the fingers extended covering the anus. That picture also shows a gloved hand on one of the buttocks. Dr. Prahlow noted that in other photos there seemed to be very little if any movement or purposeful change in hand and body position other than what might have been done by someone else. He also noted what appeared to be a wet mark on the bed sheets that could represent urine from a loss of bladder control. Although the stain could be water or another liquid, it was located where urine would be if the person in the picture lost bladder control. These facts along with the other photos showing contusions, bruises, or other signs that suggest a struggle, led Dr. Prahlow to conclude that the woman in the photographs was an unwilling participant.

Dr. Prahlow could not base his opinion on a single picture. Instead, he based his opinion on all the photographs taken together as a whole. In several, he observed that either the woman's fingers do not move from one pose to another or her whole body position does not move from one photo to the next. In other photos, a vibrator appears to be in the anus and the hands and fingers are not moved. In Dr. Prahlow's opinion, there appears to be no response to the vibrator within the anus.

After this preliminary examination of Dr. Prahlow, Malinski moved to exclude his testimony as not based on reliable scientific principles. The court denied Malinski's motion, concluding that the testimony that the State wished to elicit was not scientific testimony governed by Rule 702(b). Instead, it was expert testimony based on his specialized knowledge. We agree.

The evidence before us does not appear to be a matter of "scientific principles" governed by Evidence Rule 702(b). Rather, it is more a "matter of the observations of persons with specialized knowledge" than "a matter of 'scientific principles' governed by Indiana Evidence Rule 702(b)," as we said in *Jervis v. State,* 679 N.E.2d 875, 881 (Ind.1997).

As a four-year veteran forensic pathologist, Dr. Prahlow was qualified to make such observations. Doctors often testify about the injuries depicted in photographs even though they were not present when the pictures were taken and did not personally examine the injuries depicted. *Cf. Wright v. State,* 266 Ind. 327, 363 N.E.2d 1221, 1228–29 (1977) (testimony of properly qualified pathologist based on autopsy report and photographs was proper where physician who conducted autopsy was deceased).

Dr. Prahlow's testimony regarding Lori's state falls into the area of specialized knowledge of anatomy and physiology. Such area of specialized knowledge was within his scope of expertise and beyond the knowledge generally held by lay observers. Prahlow's expertise in examining and evaluating wounds, such as those de-

picted in the photos, was undoubtedly an aid to the jury.

The trial court did not abuse its discretion in admitting this testimony.

## VI. Proof of *Corpus Delicti* and General Sufficiency

Finally, Malinski insists that the State failed to prove *corpus delicti* and produced insufficient evidence to support his convictions.

 Our *corpus delicti* rule holds that a crime may not be proven based solely on a confession. *Sweeney v. State,* 704 N.E.2d 86 (Ind.1998). "Admission of a confession requires some independent evidence of the crime including evidence of the specific kind of injury and evidence that the injury was caused by criminal conduct." *Workman v. State,* 716 N.E.2d 445, 447 (Ind.1999). "This evidence need not prove that a crime was committed beyond a reasonable doubt, but merely 'provide an inference that a crime was committed,'... 'an inference that may be established by circumstantial evidence.' " *Id.* at 447–48.

Of course, this is not a confession case. In fact, Malinski maintained his innocence at all times. Thus, the question is whether the evidence is sufficient to allow a jury to find that Lori is dead and that Malinski killed her.

 The evidence shows that on July 21, 1999, a neighbor saw an unknown person enter the Kirkley residence, that Lori later came home, and that a short time later her Ford Explorer left the residence. Lori has not been seen since. Police found her blood spattered in the kitchen and on a butter knife. They also found her eyeglasses broken. Lori's eyewear and her daily medication were left behind. Her prescriptions had not been refilled. Such evidence provides an *inference* that a crime was committed, that is, that Lori was abducted and murdered.

Then there is the dumpster note. It states that Lori was killed and that the body would never be found. The note was produced on a computer near Malinski's desk at his place of employment, and Malinski admitted leaving the note at the dumpster. The note said the victim bit off the tip of the murderer's finger, and dental examination of an injury to Malinski's finger confirmed a human bite, although the tip was not completely bitten off. The bite mark on Malinski's finger and the injuries observed by his coworkers, together with his false explanation that he sustained the injuries helping his brother, all supply an inference that he murdered Lori, and sustained injuries during her attempts to defend herself.

Other evidence corroborated the dumpster note. In his second statement, Malinski told police that Lori's blood was in his house. One bloodstain from Malinski's bedroom carpet was determined to be human blood. It appeared the stain had been washed.

The Polaroids also suggest that Lori was murdered and that Malinski was the person who killed her. In those pictures, Lori is partially nude, handcuffed, and has her legs tied up. The expert testimony of Dr. Prahlow was that the photos demonstrate that Lori was an unwilling participant and that she appeared to be incapacitated, unconscious, or dead in the pictures.

There is also the cellmate's testimony that Malinski asked him to destroy some pictures of Lori when he got out of jail because they were bad photos and he would get in trouble if anybody saw them. Malinski told him that they showed Lori in handcuffs. If believed, the note and the circumstantial evidence were sufficient to convict Malinski of murder.

Malinski says he provided an innocent explanation for Lori's disappearance—that

Lori and he planned to run away together, but that she ultimately left on her own because Malinski had a change of heart. The jury was not required to believe Malinski's account of the events.

Malinski further argues that there is insufficient evidence to support his convictions because the body of the alleged victim has never been recovered. But production of the victim's body is not required in a murder prosecution if circumstantial evidence shows that death did occur. *Campbell v. State*, 500 N.E.2d 174, 179 (Ind.1986). There was ample evidence from which the jury could determine that Lori had in fact been killed. The circumstantial evidence was adequate to allow a jury to conclude beyond a reasonable doubt that Malinski murdered Lori Kirkley.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.