## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 25 2020, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kelly M. Starling
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lauren A. Jacobsen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

D.G.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

March 25, 2020

Court of Appeals Case No.
19A-JV-2138

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Ryan K. Gardner, Magistrate

Trial Court Cause No.
49D15-1904-JD-352

**Bailey, Judge.**

# Case Summary

[1] D.G. was adjudicated a delinquent child for committing an act that would constitute Level 3 felony Rape if committed by an adult.[1] D.G. now appeals, challenging the admission of evidence and whether there is sufficient evidence to support a true finding.

[2] We reverse.

# Facts and Procedural History

[3] In April 2019, the State filed a petition alleging D.G. committed a delinquent act that would constitute Rape, as a Level 3 felony, if committed by an adult. The petition was filed after M.J. recognized herself in a video depicting her sexual penetration by an unknown male (whom she believed to be D.G.). The State alleged that D.G. had the opportunity to commit the act in December 2016. At that time, D.G. was fifteen years old. He attended a house party at the residence of M.J., who was also fifteen years old. About a year and a half later, an unknown person showed M.J. a five-second cellphone video that M.J. believed depicted D.G. sexually penetrating her. M.J. reported seeing the video, which led to the instant matter. Before the fact-finding hearing, D.G. sought to exclude testimony concerning the content of the video, which had not been located. Following a hearing on the issue of admissibility, the court

---

[1] Ind. Code § 35-42-4-1(a)(2).

declined to exclude the evidence. The case proceeded to a fact-finding hearing at which the court admitted the challenged evidence over D.G.'s objection.

[4] At the fact-finding hearing, there was testimony that M.J. and a female friend, D.P., were drinking alcohol at M.J.'s house while her parents were at work. Two boys came over—D.G. and his friend, B.W. The group hung out together in a downstairs room, where D.G. and M.J. drank alcohol and smoked weed. M.J. became intoxicated to the point that she could not walk. D.P. asked D.G. and B.W. to carry M.J. to her upstairs bedroom. As they did so, D.P. stayed downstairs, cleaning up before M.J.'s parents came home. Once M.J. was upstairs, M.J. was sitting on her bed, leaning over and attempting to vomit. B.W. thought M.J. might need medical attention. He went to speak with D.P. about his concerns, leaving D.G. alone with M.J. When B.W. left the room, D.G. was beside M.J., holding her hair as she attempted to vomit.

[5] D.P. did not recall a conversation with B.W. She recalled being downstairs for "ten to fifteen minutes before [she] got back up there" to M.J.'s room. Tr. Vol. II at 55. B.W. testified that he spoke to D.P. for "[n]ot even five minutes." *Id.* at 68. He testified that he spoke to D.P. in the kitchen, which was "three or four steps outside of [M.J.'s] room." *Id.* at 67. He testified that the door to M.J.'s room was open, and the only sound coming from M.J.'s room was "her puking and trying to puke." *Id.* at 70. B.W. testified that, when he returned to M.J.'s bedroom, he saw D.G. "still sitting there holding her hair." *Id.*

[6]     After B.W. spoke with D.P., B.W. and D.G. left.  D.P. testified that she went to M.J.'s bedroom, where M.J. was on the floor with her eyes closed.  D.P. tried but could not wake M.J.  D.P. noticed that M.J.'s pants were unzipped.  D.P. stayed with M.J., concerned M.J. might choke on vomit.  After M.J.'s mother came home, D.P. left.  M.J.'s mother noticed that one of the buttons on M.J.'s shorts was unbuttoned.  As to M.J., she recalled being brought upstairs.  She recalled waking up with her pants unzipped and "puke everywhere."  *Id.* at 37.

[7]     M.J. later heard that D.G. "was telling people that [they] had sex."  *Id.* at 39. In February 2017, M.J. confronted D.G. through a social-media program:[2]

> [M.J.:]     why you tellin people you fucked me
>             ?
>
> [D.G.:]     Whattttt [a series of emoticons]
>
> [M.J.:]     don't fucking lie to me about it. why is everyone
>             telling me that they're hearing i you fucked me.
>
> [D.G.:]     U don't remember shit bout that night do u
>             [emoticon] u don't need to drink anymore Stg
>             I never lied [emoticon]
>
> [M.J.:]     so you raped me

---

[2] The evidence of their exchange consists of a series of screenshots.  Unless otherwise noted, we transcribed the pertinent image content verbatim.  *See McGuire v. State*, 132 N.E.3d 438, 442 at n.3 (Ind. Ct. App. 2019) (transcribing the content of screenshots "without denoting deviation from Modern English"), *trans. denied*.

[D.G.:]    Hell no wtf
           U was grabbin on my dick and all kinds of shit
           That night


[M.J.:]    even if I remember that you decided to rape me
           is this some kind of joke [D.G.] ?
           i was passed out


[D.G.:]    No I didn't u was awake u got me fuck up then
           U passed out then me and [B.W.] took u up to ur
           room


[M.J.:]    and you stuck your fucking dick in me ??


[D.G.:]    Bc if not u was gonna eat in trouble
           Get*
           Then me and [B.W.] and [another person] picked
           up the house so I didn't get in so much trouble we
           tried to help u as much as we cook


[M.J.:]    that doesn't have anything to do with you fucking
           me


[D.G.:]    And that mean [D.P.] took them back out if thy still
           found them and u wanted me to u was with it I
           wasn't raping you tf
           U was grabbing on my dick all on me


[M.J.:]    that doesn't mean YOU FUCK ME [D.G.]


[D.G.:]    We was both drunk and it happen sorry Ig but I
           didn't rape u don't say that [emoticon] that's fuck
           up if u say that
           I really didn't

[M.J.:]       no no you weren't even drunk
just stop texting me please

[D.G.:]       Whatttttttttttt [emoticon]
Ight
Sorry [emoticon]

Ex. Vol. I at 4-9.

[8] M.J. testified about events that led to the instant proceedings. In September 2018, there was a fire drill and M.J. was outside of school. An unknown person then showed M.J. a five-second video on a cellphone. M.J. recognized herself in the video: "[I]t was my room, my hair and my body." Tr. Vol. II at 45. M.J. testified that the video showed her pants down and a penis penetrating her vagina. M.J. could not identify the male in the video. She believed it was D.G.

[9] M.J. spoke to school personnel and an investigation ensued. The investigation included reviewing surveillance footage of the fire drill. The footage was not clear enough to corroborate the showing of a cellphone video—or generate leads to identify who possessed the video. The parties stipulated to evidence that M.J. eventually provided the names of three people who were with her outside. M.J. did so only after the instant proceedings began. The stipulated evidence is that all three were contacted. One did not recall being shown a video. The other two recalled hearing about a video, but only from M.J.

[10] In a police interview, D.G. admitted to telling M.J. they had sex. He denied that any sexual contact occurred, claiming he told M.J. so he would seem cool.

The trial court ultimately entered a true finding. The court placed D.G. on probation and entered a no-contact order. The court also ordered D.G. to participate in psycho-education services and follow all recommendations.

D.G. now appeals.

# Discussion and Decision

A true finding "must be based upon proof beyond a reasonable doubt." I.C. § 31-37-14-1. When reviewing a challenge to the sufficiency of evidence supporting a true finding, "we do not reweigh the evidence or judge witness credibility." *B.T.E. v. State*, 108 N.E.3d 322, 326 (Ind. 2018). Rather, "[w]e consider only the evidence favorable to the judgment and the reasonable inferences supporting it." *Id.* We will affirm so long as there is "substantial evidence of probative value . . . from which a reasonable fact finder could conclude beyond a reasonable doubt" that the juvenile engaged in the unlawful conduct. *A.B. v. State*, 885 N.E.2d 1223, 1226 (Ind. 2008) (quoting *Al-Saud v. State*, 658 N.E.2d 907, 909 (Ind. 1995)). However, where the evidence is such that no reasonable person could be convinced of guilt beyond a reasonable doubt, the judgment cannot stand. *Easton v. State*, 228 N.E.2d 6, 11 (Ind. 1967).

The State alleged in its petition that, in December 2016, D.G. "did knowingly or intentionally have sexual intercourse with another person, [M.J.], when [M.J.] was unaware that sexual intercourse was occurring." App. Vol. II at 17.

The alleged conduct is proscribed by Indiana Code Section 35-42-4-1(a)(2).[3] The term "sexual intercourse" means "an act that includes any penetration of the female sex organ by the male sex organ." I.C. § 35-31.5-2-302. The term "unaware" means "not aware: lacking knowledge or acquaintance; Unconscious." *Glover v. State*, 760 N.E.2d 1120, 1124 (Ind. Ct. App. 2002) (quoting *Becker v. State*, 703 N.E.2d 696, 698 (Ind. Ct. App. 1998)), *trans. denied*.

[15] The State's theory was that the actor in the video was D.G. and he penetrated M.J. at the house party.[4] There is evidence of D.G. and M.J. being alone for a few minutes. That is, there is evidence that, after D.G. and B.W. carried M.J. to her room, M.J. was in a seated position and was vomiting. B.W. testified that, when he left the bedroom, D.G. was holding M.J.'s hair as she vomited. D.P. did not recall having a conversation with B.W.—only that about "ten to fifteen minutes" elapsed before she went up to M.J.'s room. Tr. Vol. II at 55. B.W. recalled speaking with D.P. for "[n]ot even five minutes, less than that."

---

[3] The delinquency petition contained factual allegations under subsection (a)(2)—which proscribes engaging in sexual intercourse with a person unaware of the intercourse—but the petition cites only subsection (a)(3), which proscribes engaging in sexual intercourse with a person who is "so mentally disabled or deficient that consent . . . cannot be given." I.C. § 35-42-4-1(a)(3). The dispositional decree reflects a true finding under subsection (a)(3), not (a)(2). However, at a prior hearing, the court recited the elements of both subsections and then concluded that "the State has met its burden beyond a reasonable doubt and or a true finding." Tr. Vol. 2 at 93. In its brief, the State now cites only subsection (a)(2). As to D.G., he cites only subsection (a)(3) but recites only the elements of subsection (a)(2). *See* Br. of Appellant at 19. Ultimately, despite these inconsistent references, D.G. and the State appear to agree that the true finding arose under subsection (a)(2).

[4] On appeal, the State argues that "M.J.'s testimony about the video was not being used to prove its content, and instead was only testimony of her own opinion and mindset . . . ." Br. of Appellee at 9 n.1. However, in its closing argument, the State asserted that M.J. "was clearly upset because she saw this video and in her words of [D.G.] penetrating her. He had is [*sic*] penis in her vagina and she was passed out." Tr. Vol. 2 at 87-88. Thus, the State invited use of M.J.'s testimony to establish elements of the offense.

*Id.* at 68. Based on D.P.'s and B.W.'s testimony, a fact-finder could reasonably conclude that D.G. and B.W. were with M.J. for about five to ten minutes— during which time they carried M.J. upstairs and then were in her bedroom while she was seated and vomiting. Moreover, based on D.P.'s and B.W.'s testimony, a reasonable fact-finder could also conclude that D.G. was alone with M.J. for approximately five minutes—during B.W.'s conversation with D.P. B.W. testified that, while he was four steps away speaking to D.P., the only sound he heard coming from M.J.'s bedroom was "her puking and trying to puke." *Id.* at 70. B.W. testified that, when he returned to M.J.'s bedroom to retrieve D.G., he saw D.G. "still sitting there holding her hair." *Id.*

[16] The State asserts that "[t]he most compelling evidence before the . . . court is D.G.'s own texted statement that he and M.J. had sex that night, although he claimed it was not rape." Br. of Appellee at 7. To the extent that D.G.'s statement, "it happen," can be characterized as an unequivocal admission of guilt, the State is responsible for laying a sufficient foundation to support the admission of that statement under our well-settled *corpus delicti* rule. The Indiana Supreme Court explained the pertinent foundation requirement in *Shinnock*, a criminal case:

> In Indiana, a person may not be convicted of a crime based solely on a nonjudicial confession of guilt. *Green v. State*, 159 Ind. App. 68, 304 N.E.2d 845, 848 (1973). Rather, independent proof of the *corpus delicti* is required before the defendant may be convicted upon a nonjudicial confession. *Id.* Proof of the *corpus delicti* means "proof that the specific crime charged has actually been committed by someone." *Walker v. State*, 249 Ind. 551, 233

N.E.2d 483, 488 (1968). Thus, admission of a confession requires some independent evidence of commission of the crime charged. *Workman v. State*, 716 N.E.2d 445, 447 (Ind. 1999). The independent evidence need not prove that a crime was committed beyond a reasonable doubt, but merely provide an inference that the crime charged was committed. *Malinski v. State*, 794 N.E.2d 1071, 1086 (Ind. 2003). This inference may be created by circumstantial evidence. *Id.*

*Shinnock v. State*, 76 N.E.3d 841, 843 (Ind. 2017). The purpose of this rule is to "prevent the admission of a confession to a crime which never occurred." *Id.*

[17] For the moment, we will put aside M.J.'s testimony about the content of the video. Looking to the remaining evidence, there is no indication that M.J. was concerned about what happened at the party—other than getting in trouble—until D.G. boasted about having sex. We cannot say that an equivocal admission to a sexual encounter—one that D.G. first represented was consensual and then recanted altogether in a police interview—is admissible under *Shinnock*. Indeed, the potential corroborating evidence is essentially that D.G. was alone with M.J., who was observed to have slightly disheveled clothing after having been recently carried up a flight of stairs. We emphasize that the State did not elicit testimony about the condition of M.J.'s clothing when she was carried upstairs or when B.W. left the room. All in all, the record is devoid of corroborating evidence that a rape occurred at the party.

[18] Turning to events in September 2018—well over a year after the party at issue—M.J. viewed a video clip on a cellphone during a fire drill. From the evidence presented, it seems the State made little effort to locate that video. Indeed, it

appears that the investigation into locating the video consisted primarily of viewing surveillance footage of the fire drill. M.J. communicated her belief that the unidentifiable male in the video was D.G. Yet, there is no indication that the State pursued a warrant to search D.G.'s cellphone or electronic data. Moreover, although there is evidence that those nearby M.J. were questioned about a video, there is no indication that D.G.'s social circle was questioned.

[19] Critically, Indiana Evidence Rule 1002—referred to as the "best evidence" rule—provides as follows: "An original writing, recording, or photograph is required in order to prove its content unless these rules or a statute provides otherwise." There are limited exceptions. Indeed, Rule 1003 provides for the admission of a duplicate. Moreover, Rule 1004 provides as follows:

> An original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:
>
> (a) all originals are lost or destroyed, and not by the proponent acting in bad faith;
>
> (b) an original cannot be obtained by any available judicial process;
>
> (c) the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing; or
>
> (d) the writing, recording, or photograph is not closely related to a controlling issue.

[20] To support admission under subsection (a), "[t]he proponent of the evidence must demonstrate that the original was lost or destroyed by showing that a diligent but unsuccessful search has been made in the place or places where the original was most likely to be found." *In re J.V.*, 875 N.E.2d 395, 401 (Ind. Ct. App. 2007) (citing *Cua v. Ramos*, 433 N.E.2d 745, 753 (Ind. 1982)), *trans. denied*.

[21] From the evidence, we cannot say that the State laid a sufficient foundation to admit M.J.'s testimony under an exception to the "best evidence" rule. Thus, to the extent it can be said that M.J.'s testimony about an unidentifiable person in a five-second video is relevant and corroborative of any admission of guilt, the testimony was inadmissible. The court should have excluded the testimony. Furthermore, as D.G suggested when seeking to exclude that testimony, the State otherwise lacks independent evidence that a crime occurred. *See* App. Vol. II at 96. It follows, then, that any admission of guilt was also inadmissible. *See Shinnock*, 76 N.E.3d at 843 (discussing the *corpus delicti* rule).

[22] Reversal is appropriate where evidentiary error affects a party's substantial rights. *See* Evid. R. 103(a); Ind. Appellate Rule 66(A). However, **retrial** is appropriate only where "considering all the trial evidence, including that erroneously admitted, sufficient evidence exists to support [the judgment]." *Bowman v. State*, 577 N.E.2d 569, 571 (Ind. 1991) (applying principles of double jeopardy); *Carr v. State*, 934 N.E.2d 1096, 1109 (Ind. 2010) ("A reversal for insufficient evidence bars retrial under the Double Jeopardy Clause, but an analysis for such sufficiency includes consideration of the erroneously admitted evidence." (footnote omitted) (citing *Lockhart v. Nelson*, 488 U.S. 33, 40 (1988))).

[23] Here, a sufficiency inquiry turns on proof that, in the five or so minutes that B.W. spoke with D.P., M.J. lacked awareness while D.G. pulled down M.J.'s shorts; engaged in sexual intercourse; pulled up her shorts, leaving the shorts unzipped and partially unbuttoned; and returned M.J. to a seated position, all without drawing the attention of those in a nearby room. In view of the evidence presented, we conclude that the State failed to prove that which is necessary to support a true finding.

[24] Reversed.

Kirsch, J., and Mathias, J., concur.