

FILED

Dec 16 2016, 8:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Danielle Green, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 16, 2016 <br><br> Court of Appeals Case No. <br> 58A04-1511-CR-2008 <br><br> Appeal from the <br> Ohio Circuit Court <br><br> The Honorable <br> James D. Humphrey, Judge <br><br> Trial Court Cause No. <br> 58C01-1406-MR-1 |

**Kirsch, Judge.**

[1] Following a jury trial, Danielle Green ("Green") appeals her conviction and sentence for murder,[1] a felony. She raises four issues that we consolidate and restate as:

> I. Whether the trial court abused its discretion when it excluded certain testimony from a defense psychologist and when it admitted evidence from an Indiana State Police crime scene investigator concerning blood spatter;

> II. Whether the trial court abused its discretion when, in sentencing Green, it gave no mitigating weight to her claims that she was a victim of domestic violence; and

> III. Whether Green's sixty-year sentence is inappropriate.

[2] We affirm.

## Facts and Procedural History

[3] In the early morning hours of May 26, 2014, Green shot Raymond Green ("Raymond") ten times, killing him. The two had been married for approximately ten years, when in January 2014 they divorced for financial reasons,[2] but continued to maintain a spousal relationship, and, at the time of the shooting, were living together in a trailer in rural Dillsboro, Indiana. Green used a five-shot, .38-caliber revolver. After shooting Raymond five times,

---

[1] *See* Ind. Code § 35-42-1-1.

[2] They divorced after learning that, if they were not married, Raymond could receive considerably more in social security benefits stemming from his first wife's death in 2002.

Green went to the other end of the trailer to empty and reload the revolver and then returned to the bedroom and shot him five more times.

[4] Green placed the empty cartridges in a plastic sandwich bag and also placed the gun into a small bag. She dragged Raymond's body out of the trailer and put it into a large metal storage box that had belonged to Raymond. Inside the trailer, she removed the sheets and blankets and cut out portions of the carpet where Raymond's blood had stained it. She packed the carpet pieces, sheets, blankets, her sweatshirt, and cleaning supplies into garbage bags and placed them into the box with Raymond's body. Then she locked the metal box with a padlock, and, using farm equipment, moved the box thirty or forty feet from the front of the trailer.

[5] Later that day and the next, Green told family and friends that their dog had attacked and killed Raymond. Raymond's family became suspicious and contacted police. At 2:30 a.m. on May 28, two Ohio County Sheriff's Department deputies went to Green's home in Ohio County to conduct a welfare check on Raymond. Green was at home with her sister and niece and told police that Raymond was not home and was at his job as a truck driver. The deputies left but returned some hours later, and Green gave them consent to search the property. Other law enforcement also arrived at the premises, including Lawrenceburg Police Department officers and Indiana State Police ("ISP") detectives. One deputy saw the large metal box, which smelled and was attracting flies, but Green said the box belonged to Raymond, she did not know what was in it, and officers would need a search warrant to search it.

After obtaining a search warrant, authorities returned to Green's home and located Raymond's body in the metal box. Law enforcement obtained a second search warrant and searched the mobile home, finding blood and weapons.

[6] During the late-night hours of May 28 and into the morning hours of May 29, Green gave an audio-recorded statement to police, admitting that she shot Raymond but stating that it was in self-defense. *State's Exs.* 213, 15-M. She told police that she woke around 6:00 a.m. to use the bathroom and walked through the master bedroom where Raymond was sleeping and that she noticed that he had a loaded, cocked, and ready-to-fire revolver on the nightstand between the bed and bathroom. She described that she bumped into Raymond as she tried to sneak out of the bathroom, and he said, "I'm going to kill you. You need to die[.]" *Id.* She said that she was in fear for her life. As Green turned her body, Raymond fell onto the bed, but then lunged toward her, at which time Green grabbed the revolver and shot Raymond five times. She said that Raymond was still alive and moving, so out of fear, she went to another room, emptied the gun, reloaded it, and returned to find Raymond seated at the foot of the bed. She told officers that at that time she could see some blood on Raymond's left side. He again told her that she needed to die and tried to lunge toward her, so she shot him five more times, and he slid to the floor.

[7] Later on May 29, a detective returned to Green's home to interview her again, and Green agreed to provide a re-enactment of the shooting. She told and showed police how she had used the bathroom around 6:00 or 6:30 a.m. and noticed the revolver on the nightstand. She also showed them how she

encountered Raymond as she was leaving the bathroom and described that he started "to come after" her. *State's Ex.* 214; *Tr.* at 1300. He told her several times, "I'm going to kill you. You need to die." *Id.* She grabbed the gun, and he fell on the bed, and although she did not remember pulling the trigger or hearing gun shots, she did remember "seeing blood on the back of his head." *Id.* Green told officers that Raymond was sitting and whispering that he was going to kill her, so she ran to the other room, unloaded and reloaded the gun, and returned to find him "sitting a little bit closer" and "he started to get up a little bit" so, being in fear for her life, she shot him again, at which time she remembered him falling to the floor. *Tr.* at 1301.

[8] On June 3, 2014, the State charged Green with murder. On August 29, 2014, Green filed a Notice of Affirmative Defenses asserting that she intended to pursue the defense of insanity pursuant to Indiana Code 35-41-3-6 and that she intended to present evidence that she acted in self-defense, including evidence of domestic violence under the effects of battery statute, Indiana Code 35-41-3-11, often called battered woman syndrome ("BWS"). Green's position was that Raymond abused her and that, when she learned that he was trying to obtain a life insurance policy on her life, she feared for her life and thought he planned to kill her and that, on the night in question, Raymond attacked her and she shot him in self-defense. In February 2015, the trial court appointed two doctors to evaluate Green pursuant to her assertion of an insanity defense.

[9] Green hired Dr. Karla Fischer ("Dr. Fischer"), a research psychologist, law professor, and domestic violence consultant, to conduct an evaluation of Green.

Green intended to present Dr. Fischer's testimony regarding the role of domestic violence in the crime. Dr. Fischer met with and interviewed Green on February 9 and 10, 2015. Dr. Fischer evaluated Green by use of an Abusive Behavior Observation Checklist ("ABOC"), an interview, and a post-traumatic stress disorder ("PTSD") DSM-5 symptom inventory. Green told Dr. Fischer that Raymond had abused her, emotionally, physically, and sexually, for years. Dr. Fischer concluded that Green had been the victim of years of domestic violence and suffered from PTSD and that Green did not plan or intend to kill Raymond. A few days after her evaluation with Dr. Fischer, Green filed a Notice of Withdrawal of Affirmative Defenses, withdrawing her intent to use the statutory defenses of insanity and BWS. *Appellant's App*. at 98-99.[3]

[10]  Following its deposition of Dr. Fischer in May 2015, the State filed a Motion in Limine to Exclude the Testimony Dr. Karla Fisher, on the basis that her statements about the alleged abuse suffered by Green would be hearsay, that she was not qualified to and did not properly diagnose PTSD, and that her testimony bore upon the affirmative defenses that Green withdrew. *Tr*. at 114-17.[4] The trial court conducted an evidentiary hearing, and Green presented the

---

[3] After Green filed her Notice of Withdrawal of Affirmative Defenses, the trial court issued an order vacating its previous appointment of two doctors to examine Green. *Appellant's App*. at 1212.

[4] The CCS reflects that the State filed its Motion in Limine to Exclude the Testimony of Dr. Karla Fischer on June 23, 2015. *Appellant's App*. at 22. Although the thirteen volumes of Appellant's Appendix contain documents that are, for the most part, in chronological order, the Motion in Limine is not found in Volume 5 of Appellant's Appendix, containing documents dated from June 1, 2015 to July 7, 2015. Neither party cites to the Motion's location in the Appellant's Appendix. *Appellant's Br*. at 10 (not citing to record); *Appellee's Br*. at 6, 17 (citing to Transcript of hearing on Motion). Our conclusion is that the Motion in Limine is not included in the record before us.

testimony of Dr. Fischer, who testified that her opinions and conclusions would include that Green had PTSD resulting from domestic violence and that she was in a traumatized state at the time of the shooting, as well as after the shooting, due to PTSD. The State presented the testimony of Dr. Edward Connor ("Dr. Connor"), a licensed psychologist, who noted the differences between psychology used in epidemiological psychology as compared to clinical psychology and forensic psychology. Dr. Conner stated that PTSD is a mental illness and that, in Indiana, one must be a licensed psychologist to make a diagnosis of PTSD. *Id.* at 225. He also testified that Dr. Fischer did not follow recognized protocols that would consider reliability and validity scales or use a psychometric-based assessment in order to assess if the person was malingering or embellishing, which would be appropriate to do when, as here, the person had been charged with a crime. *Id.* at 223, 225, 226.

[11] After taking the matter under advisement, the trial court entered a written order in August 2015 granting the State's motion in limine. The court found, among other things, that (1) Dr. Fischer had extensive experience as a research psychologist but that she "has no experience or expertise as a clinical psychologist or a forensic psychologist[,]" and (2) although she diagnosed [Green] with [PTSD] due to shooting [Raymond] and due to being a victim of domestic violence[,]" Dr. Fischer had received no formal training regarding the diagnosis of PTSD and that her diagnosis of PTSD "was not done according to standards recognized by the scientific community." *Appellant's App.* at 1322-23. The trial court further observed that Dr. Fischer's evaluation did not contain

reliability measures and did not test for malingering, which would assess whether Green was embellishing or exaggerating her situation. The trial court also concluded that Green was attempting to admit evidence in support of an insanity defense and a BWS defense, both of which Green had withdrawn. The trial court excluded Dr. Fischer's testimony "relating to a possible defense under I.C. 35-41-3-11 (Effects of Battery) . . . and any other findings or opinions related to a finding of PTSD." *Id.* at 1327. The trial court ordered that "[o]ther proposed testimony of Dr. Fischer will be considered . . . following an offer to prove . . . and a decision by the Court as to its relevance and admissibility." *Id.* at 1327-28.

[12] During the two-week trial, considerable evidence was presented regarding the parties' relationship. Green and Raymond first met in 2001 in Texas. At that time, Raymond was married to his first wife, and they had one daughter together, Tracey. Raymond was working as a farrier, which is a blacksmith who shoes and trims hooves of horses, and Raymond met Green through his job, as he trimmed and shoed Green's horses. In May 2002, Raymond's wife died in a bridge collapse accident, and he received approximately one million dollars from his wife's estate and in a settlement from the bridge collapse. After his wife's death, Green spent more time around Raymond's ranch. In August 2003, Green's marriage to her then-husband was dissolved, and, in May 2004, Raymond and Green eloped.

[13] In or around 2004, Raymond and Green moved to Florida and purchased real estate worth approximately one million dollars in an equestrian community,

which included property for Green to train horses. Raymond and Green became friendly with some neighbors, and they began participating in a Cowboy Action Shooting Club ("the Shooting Club"). The Shooting Club held regular events where club members dressed-up as cowboys in period attire and participated in shooting competitions using replica firearms "from the old west."[5] *Tr.* at 848. Green won numerous shooting competitions.

[14] When the money began to run out, Raymond obtained a job mowing property for their homeowner's association and performed various other duties for the association and individual neighbors to earn additional income. Raymond and Green struggled financially and ultimately had to sell their property in a short sale. *Id.* 931, 1271-72. In 2012, Green moved to her parents' property in Dillsboro, Indiana, and Raymond moved in with his friend in Florida and continued to work. *Id.* 960-61, 963, 1272-73. When Green was in Indiana and Raymond was in Florida, Raymond resumed communications with his family and visited Tracey and her children in Texas for the first time in eight years; Green was angry about Raymond's trip to see Tracey.

[15] After Green came to Indiana, she initiated correspondence with a man named George Mann ("Mann"), who had been a fellow member of the Shooting Club in Florida. Beginning in November 2012, Green and Mann communicated

---

[5] The Shooting Club members chose aliases that were often a reference to a historical character, which names the members would use among themselves. Green went by the name "Dani Oakley," and Raymond was called "Doc R. Green." *Tr.* at 849.

frequently by phone, email, and other electronic means. *Tr.* at 856-86; *State's Exs.* 105A, 105B. They exchanged hundreds of emails and spent hours on the phone together. *Id.*

[16]     In 2013, Green's parents died. In late 2013, Raymond moved from Florida to Indiana to be with Green. They lived in a rural area, in a trailer on Green's parents' property. After coming to Indiana, Raymond obtained his commercial driver's license and started to work as a trucker. When he was offered the job, Raymond contacted Select Quote insurance to compare prices for life insurance on himself with the rates being offered by his new employer. *Tr.* at 1061. Raymond Kwong ("Kwong"), the insurance agent, asked Raymond if he would mind if Kwong sent a complimentary quote for life insurance for Green, and Raymond agreed. *Id.* at 1062. Kwong provided quotes for policies ranging from $100,000 to $500,000. Raymond also desired to buy an insurance policy for his daughter, Tracey, to provide security for his grandchildren, but Raymond did not want Green to know about the policy for Tracey because he knew Green would be angry, so he asked Kwong not to send any documents with Tracey's name on them to his home. When paperwork with Tracey's name on it was inadvertently sent to the home that Green and Raymond shared, Green called Kwong to ask if Raymond was trying to purchase a policy on Tracey, and Kwong, realizing that Raymond did not want Green to know about it, stated, "Not to my knowledge[,]" and indicated it was a mix-up on his part. *Id.* at 1106. Evidence at trial was that Green made statements to Mann and others shortly before and after the murder that she was worried and was

suspicious that Raymond was trying to obtain a large insurance policy on her life, which she did not want.

[17] The State also presented at trial evidence from friends and family that Raymond was a kind, affable, hard-working man, and that they had not seen signs of abuse by Raymond toward Green. The State presented evidence that Green was disciplined and determined, focusing much of her time, energy, and money on her horses. Evidence was presented that at Green's insistence, Raymond and Green shared a single cell phone while in Florida, which she solely controlled, and Green isolated Raymond from nearly all contact with his family and blocked calls from their phone numbers.

[18] With regard to the murder, the State presented testimony from Dr. Jennifer Schott ("Dr. Schott"), a deputy coroner for the Hamilton County Coroner's Office, who performed the autopsy on Raymond. Dr. Schott testified that Raymond was shot five times in the head, with four bullets entering the back of the head and one entering at the left temple. *Tr.* at 815-16. None of those five bullets exited Raymond's head. Dr. Schott stated that, most of the time, a gunshot wound to the head would make someone instantly unresponsive. Dr. Schott also recovered five bullets from the torso. Raymond had been shot twice in the back, with the trajectory moving from back to front and downward. *Id.* at 833. Three bullets entered the left side of his torso, with one of those having first passed through his left arm. Dr. Schott opined that the gunshot wounds to the torso would not have been instantaneously fatal, and although the time of survivability would vary, generally a person would survive a matter of minutes,

and speech and movement "could be possible." *Id*. at 843. Dr. Schott was not able to determine in what order the ten shots occurred. *Id*. at 840. Raymond ultimately died from multiple injuries to the brain, lungs, diaphragm, and other organs.

[19] The State's theory was that Green shot Raymond as he slept in bed; Green's position was that in the days leading up to his death, she had been in fear for her life, especially after learning that Raymond was seeking to take out a life insurance policy on her life, and that Raymond confronted her in the early morning hours as she left the bathroom and he was going to shoot her, but she took the gun and shot him, and that after she shot him, he was still attempting to move toward her, so she shot him five more times. Prior to trial, Dr. Schott had, with Green's attorney, viewed the video in which Green, while on premises where the shootings occurred, described to detectives her version of events. Dr. Schott was asked whether Green's version "would [] be consistent with the injuries and entrance wounds that [Dr. Schott] saw," and she replied that Green's scenario "was not consistent with all the injuries of the body." *Id*. at 844. In support of its argument that she shot Raymond while he slept in bed, the State presented evidence that several bullets passed through the sheet and comforter on the bed before striking Raymond's body. *Id*. at 562-66, 1194, 1205-06.

[20] The State also presented testimony, over Green's objection, of ISP Sergeant Stephen Weigel ("Sergeant Weigel"), a crime scene investigator, concerning, among other things, blood spatter. Green objected on the basis that Sergeant

Weigel did not possess the proper qualifications to interpret blood spatter. After allowing both parties to question Sergeant Weigel out of the jury's presence, and after reviewing case law, the trial court overruled Green's objection. Sergeant Weigel testified that he observed expired blood on the leg of a TV stand and along the lower wall areas. *Id.* at 1157, 1160, 1163, 1166. He described expired blood as occurring when there has been an injury to the mouth or throat, or there is blood in the lungs, and the blood goes into the person's mouth, mixes with saliva, and is expelled by cough or gasp from the person's mouth. *Id.* at 1158. Little bubbles form in the blood, which pop when the blood hits a surface and leave visible "bubble rings." *Id.* Sergeant Weigel stated that based on where he saw the blood, Raymond would have been lying down and expelling blood. *Id.* at 1160. Sergeant Weigel also testified that some of the droplets found in the bedroom indicated that they were "blood in flight" meaning it traveled a distance in a downward position. *Id.* at 1163-64, 1166.

[21] The State also presented evidence that on two separate days in March 2014, Green performed a number of internet searches about what would happen if a person were shot in the head with a .38 caliber gun. She conducted several searches and visited websites about whether a shot from a .38 caliber gun would kill a person instantly or go straight through the head. She also read articles about how Gabrielle Giffords, the Congresswoman who was shot in the head, survived her injuries. In late April, and again on the day of the murder, Green also conducted internet searches to learn how to change the bank into which

Social Security benefits are deposited.  After her arrest, Green gave Mann power of attorney to manage her affairs.  *Id*. at 898.

[22]   During the defense case-in-chief, Green moved to incorporate the evidence and arguments from the pretrial proceedings on the State's Motion in Limine and renewed her request to have Dr. Fischer be permitted to testify.  *Id*. at 1361-62. The trial court affirmed its earlier ruling excluding Dr. Fisher's testimony as to her proposed opinions and conclusions relating to a possible defense under BWS and any opinions regarding PTSD.  In support of her theory that Raymond had confronted her, and she shot him to save her own life, Green presented evidence that she sent a series of frantic texts to her friend in Florida, Mary Gombos ("Gombos") over the course of the weekend of Raymond's murder.  On the day of the murder, Green told Mann that Raymond was irate because she had been packing his things and told him to leave, and because she sounded afraid, Mann suggested that she contact police, but she refused.  *Id*. at 869-70.  Green did not testify at trial.

[23]   At the conclusion of the two-week trial, the jury found Green guilty of murder on September 1, 2015.  Following a sentencing hearing, the trial court took the matter under advisement and later issued a sentencing statement, determining that Green planned Raymond's death, shot him as he slept, hid his body in a metal box along with evidence of the shooting, and then lied to friends, family, and police.  *Appellant's App*. at 1410-14.  The trial court found that Green's claim that she was the victim of domestic abuse was not credible and did not consider this as a mitigator.  *Id*. at 1412-13.  The trial court sentenced Green to

the Indiana Department of Correction for sixty years. Green now appeals her conviction and sentence.

## Discussion and Decision

## I. Exclusion and Admission of Evidence

[24] The decision to admit or exclude evidence is a matter within the sound discretion of the trial court. *Jimerson v. State*, 56 N.E.3d 117, 120 (Ind. Ct. App. 2016), *trans. denied*; *Cook v. State*, 743 N.E.2d 563, 570 (Ind. Ct. App 2000). An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances of the case or misinterprets the law. *Jimerson*, 56 N.E.3d at 570. We afford an evidentiary decision great deference upon appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Id*. In determining whether an evidentiary ruling affected a party's substantial rights, we assess the probable impact of the evidence on the trier of fact. *Kirk v. State*, 974 N.E.2d 1059, 1066 (Ind. Ct. App. 2012), *trans. denied*.

[25] Indiana Evidence Rule 702 governs the admission of testimony by expert witnesses:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Under this rule, a witness may be qualified as an expert by virtue of "'knowledge, skill, experience, training, or education[,]'" although only one characteristic is necessary to qualify an individual as an expert. *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003) (quoting Ind. Evidence Rule 702(a)). Accordingly, an individual may qualify as an expert based upon practical experience alone. *Id.* Expert testimony that consists of observations of someone with "specialized knowledge," rather being based on matters of "scientific principles," is not governed by the requirements of Rule 702(b). *See Malinski v. State,* 794 N.E.2d 1071, 1085 (Ind. 2003) (forensic pathologist permitted to testify as to his opinion that murder victim was unwilling participant in bondage based on his review of photographs at scene).

## A.  Exclusion of Dr. Fischer's Testimony

[26] Green argues that it was error for the trial court to exclude the testimony of her proposed expert, Dr. Fischer, and asserts that Dr. Fischer's excluded testimony "bore on [her] claim of self-defense by explaining why [she] reasonably believed that Raymond threatened her life[,]" and it "would have discounted [the State's] arguments that [Green]'s odd behavior after Raymond's death showed premeditated murder." *Appellant's Br.* at 36-37.  Here, at the evidentiary hearing on the State's Motion in Limine, Dr. Fischer testified about her credentials and about her evaluation of Green.  Dr. Fischer possesses a bachelor of science in

psychology and a master's degree in psychology. She also has a law degree and a Ph.D. in Psychology. At the time of the hearing, Dr. Fischer was an adjunct law professor at the University of Illinois, where she ran the law school's domestic violence clinic, and, separately, she offered domestic violence consulting services.

[27]   Dr. Fischer's evaluation of Green included reviewing pleadings and discovery documents from the pending litigation and meeting with Green for two eight-hour days. Dr. Fischer evaluated Green by using the ABOC and the DSM-5[6] symptom inventory for PTSD. She opined that Green suffered from PTSD resulting from years of abuse, and this history of abuse and PTSD caused Green to have anxiety about her safety in the days leading up to the murder. Dr. Fischer stated that Green's PTSD symptoms resulted both from the past domestic violence and from the trauma of killing Raymond. Dr. Fischer testified that Green entered a "traumatized state" when she encountered Raymond attacking her that night, and Dr. Fischer determined that, after the shooting, Green still believed that Raymond posed a threat to her, which is why she padlocked the metal box and placed it thirty feet from the home. *Tr.* at 205, 208. Dr. Fischer concluded that Green did not plan Raymond's killing because those who plan to kill have rehearsed the event in their mind, such that they are not traumatized by the killing itself.

---

[6] DSM-5 appears to refer to the Diagnostic and Statistical Manual of Mental Disorders.

[28] On appeal, Green argues that the trial court erred when it determined that Dr. Fischer was not qualified as an expert witness to either diagnose Green as having PTSD or to testify to her opinions that Green suffered from PTSD at the time she shot Raymond and afterward, when she hid his body. In arguing for her qualifications, Green notes that Dr. Fischer has testified twice in Indiana "on state of mind and PTSD symptoms" and on how those symptoms impacted a defendant's behavior, and Dr. Fischer spent approximately six months studying and training on how to identify PTSD, including working with "over a hundred volunteers[.]" *Appellant's Br.* at 38.

[29] As the trial court found, Dr. Fischer is not licensed as a clinical or counseling psychologist, nor has she received training as a clinical or forensic psychologist. She teaches as an adjunct professor and independently offers what she characterizes – not as a business, or firm, or practice – but "domestic violence consulting services." *State's Ex.* 2-M (Fischer Dep. at 15-16). Her testimony was that she learned to diagnose PTSD from graduate students who were performing a study of the prevalence of PTSD in the community. *Tr.* 185-87; *State's Ex.* 2-M (Fischer Dep. at 24-25). Dr. Fischer testified that she only diagnoses abuse victims who suffer from PTSD and would not feel comfortable diagnosing any other mental illness or PTSD resulting from other causes. *Tr.* at 184-86. Dr. Fischer testified in her deposition, "I don't diagnose for the purpose of treatment like a clinical or counseling psychologist would do. I diagnose from a research epidemiological per[sp]ective, which means from a research perspective." *State's Ex.* 2-M (Fischer Dep. at 19-20). She further

explained that in some cases she does not "diagnose" but provides self-reporting measures to provide "sort of a self-assessment." *Id*. (Fischer Dep. at 21). When specifically asked about whether she "diagnoses" someone for PTSD or, rather, only "assesses" them to see if they have the symptoms, she replied:

> Well, it's kind of the same thing. The assessment is you go symptom by symptom and determine whether or not they have that symptom. And then there's a rubric, essentially, that says if you have enough symptoms in each category, that means you have the disorder. So to assess is sort of to diagnose at the same time.

*Id*. (Fischer Dep. at 22). The series of symptoms is a checklist of questions that comes directly from the DSM-5. Dr. Fischer acknowledged that her domestic violence evaluation "is not a clinical psychologist evaluation." *Id*. (Fischer Dep. at 23).

[30] Similar in manner to the PTSD evaluation, Dr. Fischer conducted a domestic violence assessment of Green, which was done using the ABOC, which Dr. Fischer explained was a "research instrument" consisting of a nine-page checklist "of pretty much every abusive behavior that one person could do to another." *Id*. (Fischer Dep. at 28). The ABOC came from a treatise called "Empowering and Healing the Battered Woman," and the ABOC "was intended to be used as a paper and pencil test that someone could fill out him or herself," but Dr. Fischer uses it in an interview format. *Tr*. at 169.

[31] Dr. Fischer's evaluation of Green did not include reliability measures, and she did not conduct any assessment for malingering. Dr. Connor, the licensed

psychologist who testified at the hearing on the State's Motion in Limine, stated that PTSD is a mental illness, that in Indiana one must be a licensed psychologist to diagnose someone with PTSD, and that Dr. Fischer's methodology and diagnosis of PTSD was not done according to standards recognized by the scientific community. Based on the record before us, the trial court did not err in finding that Dr. Fischer was not qualified to testify to her opinions that, due to years of domestic abuse by Raymond, Green suffered from PTSD.

[32] Furthermore, Green sought to present Dr. Fischer's testimony to show that, because of domestic violence and resulting PTSD, Green was in a "traumatized" mental state at the time of the shooting and was unable to conform her behavior to the law. Green withdrew her insanity defense and did not submit to the mental examinations required by Indiana Code 35-41-3-6, and, as the trial court found, she "cannot now seek to present [that defense] without following the dictates of the statute." *Appellant's App*. at 1326.

[33] Green also withdrew her BWS affirmative defense under Indiana Code section 35-41-3-11, which applies to "circumstances when the defendant in a prosecution raises the issue that the defendant was, at the time of the alleged crime, suffering from the effects of battery as a result of the past course of conduct of the individual who is the victim of the alleged crime." When a defendant charged with a crime involving force against a person wants to introduce evidence that, at the time of the alleged crime, they suffered from the effects of past violence by the victim of that crime, they can only do so as

provided under Indiana Code Section 35-41-3-11. *Marley v. State*, 747 N.E.2d 1123, 1127-28 (Ind. 2001). While BWS evidence may be admissible for other purposes in other contexts, its use to explain the impact of past violence by the victim upon the defendant's behavior at the time of the crime is only admissible as it bears upon the defenses of insanity or self-defense.[7] *Id*. "[W]here the defendant claims that battered women's syndrome has affected her ability to appreciate the wrongfulness of her conduct, she must proceed under the insanity defense." *Id*. at 1128. This includes any claim that is in the nature of suggesting that the defendant lacked the knowledge, intent, or subjective awareness necessary to commit the crime as a result of some abnormal mental condition or disease. *See id*. at 1128 (defendant's claim that she was in "dissociative state" as result of BWS "is a claim that an abnormal condition [] impaired the defendant's perception" and falls within insanity defense). Although Green contends that she did not intend to present Dr. Fischer's testimony to support a claim of insanity, meaning she was not asking the jury to find her not guilty by reason of insanity, she was offering the testimony to show that BWS affected her ability to appreciate the wrongfulness of her conduct, and our Supreme Court in *Marley* determined that Indiana Code 35-41-3-11 requires her to comply with the insanity statute. *Id*. at 1128.

---

[7] The *Marley* Court observed that excluding "battered women's syndrome evidence as to a defendant's state of mind where the defendant has not complied with the insanity statute does not affect its admissibility for other purposes," such as to explain why she remained with an abusive boyfriend or spouse or to explain why she recanted her story. *Marley v. State*, 747 N.E.2d 1123, 1129 (Ind. 2001).

[34] Here, the trial court acted within its discretion to find that Dr. Fischer's testimony – stating that she believed Green suffered from years of domestic abuse and, as a result, suffered from PTSD and was in a "traumatized" state at the time of the crime – was in the nature of opinions in support of an insanity defense. The trial court determined, and we agree, that Green "cannot [] admit evidence of this defense through this proposed expert witness after withdrawal of this exact defense . . . relating to the 'effects of battery.'" *Id.* at 1327. Based on the record before us, we conclude that the trial court did not commit reversible error when it excluded the proposed testimony of Dr. Fischer.[8]

[35] In its order granting the State's Motion in Limine, the trial court stated that it would consider at trial the relevance and admissibility of "other proposed testimony of Dr. Fischer," presumably testimony concerning domestic violence and its impacts, following an offer to prove. *Appellant's App*. at 1327-28; *Tr*. at 1363. To the extent some testimony of Dr. Fischer may have been admissible, Green did not request admission of such limited testimony or make an offer to

---

[8] Though it was not the basis of the trial court's decision to exclude Dr. Fischer's testimony, the State asserts that it was proper for the trial court to exclude her testimony because it would have consisted entirely of what Green had told her and was hearsay because Green did not testify and other witnesses, the State claims, did not provide adequate factual foundation for consistent and long-lasting abuse to which Dr. Fischer would testify. "Without the factual history of alleged domestic violence that formed the foundation for Dr. Fisher's opinions, any testimony she provided would have been confusing and unfairly prejudicial. Admitting expert testimony without a factual basis for the jury to assess could only serve to unfairly bolster [Green]'s claims by giving the implicit approval of an 'expert.' The testimony would also be of such limited probative value that it must be excluded." *Appellee's Br.* at 22-23. Having resolved the issue on other bases, we do not address the State's arguments.

prove as to what that other testimony would be. Thus, any issue in that regard is waived. *Carter v. State*, 932 N.E.2d 1284, 1287 (Ind. Ct. App. 2010).

### B. Admission of Blood Spatter Evidence

[36] Green argues that Sergeant Weigel was not qualified as a blood spatter expert, and the trial court committed reversible error by admitting his testimony concerning blood spatter. Green explains that, although Sergeant Weigel, through his work experience and blood spatter training, may have been qualified to collect and catalog evidence at the scene, he was not qualified to interpret or "attach meaning" to the blood droplets found at the scene and testify to those opinions at trial. *Appellant's Br*. at 48-49. In particular, Green argues that it was error to permit Sergeant Weigel to testify about the position of Raymond's body – *i.e.*, that Raymond was lying down when he expelled blood – based on droplets and expired blood found at the scene.

[37] At trial, Green posed repeated objections to Sergeant Weigel's qualifications and his ability to testify regarding his interpretation of evidence found at the crime scene. Both parties were permitted to question Sergeant Weigel outside of the jury's presence. Testimony was elicited that Sergeant Weigel had been a crime scene investigator for approximately ten years, that during his experience processing crime scenes he dealt with blood spatter, and in 2013 he received the required two weeks (eighty hours) of training on blood spatter evidence, but as of trial, he had not yet taken the required test. The State asserted that it was not seeking to have Sergeant Weigel testify as an expert, but rather a skilled witness. Consistent with that, Sergeant Weigel acknowledged that he was not

yet qualified as an expert, testifying that ISP had two blood spatter experts on staff, one of whom was Dean Marks ("Marks"). Sergeant Weigel testified that, after he had viewed the scene of Raymond's shooting, he formed opinions about the blood droplets, and he thereafter spoke with Marks about those opinions and that Marks confirmed those findings. After receiving counsels' arguments, the trial court, relying on *Grinstead v. State*, 684 N.E.2d 482, 487 (Ind. 1997), found that Sergeant Weigel satisfied the requirements to present the proferred testimony regarding the blood spatter. *Tr.* at 1151-52. We find that *Grinstead* supports the trial court's ruling.

[38]    In *Grinstead*, the defendant was convicted of, among other things, murder. During trial, the State introduced testimony from a police officer about blood spatter found on Grinstead after the crime, in order to rebut Grinstead's claim that he was not near the victim at the time of that the victim was beaten with a tire iron. *Grinstead*, 684 N.E.2d. at 486. The officer testified that the blood spots on Grinstead's person were "medium impact" spattering, which allowed the jury to infer that Grinstead was closer to the victim than he had claimed. *Id*. Grinstead was convicted, and on appeal, he claimed that the officer lacked sufficient skill, knowledge, and experience to give expert evidence on blood spatters. *Id*.

[39]    After recognizing that blood spatter evidence is beyond the knowledge of the average juror and was a proper topic for expert testimony, the *Grinstead* Court addressed whether the officer who testified was qualified to do so. *Id*. at 487. The officer had received a two-week training course on the subject. The Court

determined that the officer demonstrated sufficient expertise in the subject to testify as an expert, even though he did not possess qualifications that rose to the level of a serologist. *Id*. The *Grinstead* Court concluded that the officer's training and experience were sufficient to permit him to explain the types of impacts that cause the different patterns of blood spatter and that any deficiency in the specificity or detail of the officer's testimony was an appropriate subject for cross-examination. *Id*. We find that, here, the trial court did not err in allowing Sergeant Weigel to testify regarding the blood spatter.

[40] Furthermore, even if Green is correct and Sergeant Weigel's testimony was erroneously admitted, we find that any error was harmless. The erroneous admission of evidence is deemed harmless unless such error affected the substantial rights of the parties. Ind. Trial Rule 61; Ind. Evidence Rule 103(a). In determining whether reversal is mandated, we must assess the probable impact of the improper evidence upon the jury. *Greenboam v. State*, 766 N.E.2d 1247, 1256 (Ind. Ct. App. 2002), *trans. denied*. The erroneous admission of evidence is harmless when there is substantial independent evidence of guilt such that it is unlikely that the erroneously admitted evidence played a role in the conviction. *Id.* However, reversal is warranted if the record as a whole reveals that the improper evidence was likely to have had a prejudicial impact on the average juror such that it contributed to the verdict. *Id.*

[41] Here, Green's argument is that the position of Raymond's body "played a large role in this conviction" because "[t]he positioning of the blood droplets on the lower part of the wall coupled with the expired blood on the floor," to which

Sergeant Weigel testified, "seemed to show Raymond had been lying down and rolled onto the floor where he died. This version of events undermined [Green]'s defense." *Appellant's Br.* at 49-50; *see also Reply Br.* at 19 ("This version of the evidence undermined [Green]'s defense that Raymond had been upright and attacking when she fired the gun.").

[42] Contrary to Green's claim, Sergeant Weigel's testimony did not contradict or undermine her defense. Sergeant Weigel identified a pool of blood as being caused by saturation, certain blood spots as being caused by blood in flight, and other spots as expired blood. He testified that certain blood spots on the leg of the television stand in the bedroom were expired blood, which he explained as being blood expelled from the mouth after the blood has mixed with and been diluted by saliva and occurs when a person has injury to their lungs, throat, or mouth and then the person gasps or coughs. *Tr.* at 1157-58. With regard to the specific expired blood spots on the furniture leg, Sergeant Weigel testified that certain spots would have hit the furniture leg when Raymond was lying on the floor. *Id.* at 1160. Sergeant Weigel did not testify that Raymond was in bed and rolled to the floor, as Green suggests. Rather, Sergeant Weigel's testimony was that Raymond was on the floor when he expelled blood. This distinction makes a difference, as testimony that Raymond expired blood while on the floor did not "undermine" Green's version of events, which was that Raymond was coming at her, she pushed him back on the bed and shot him, and that because he lunged at her again, she shot him again. Green did not allege that Raymond was never on the floor after he

was shot, and considerable forensic evidence showed that he was. Furthermore, Green states in her brief, "As Raymond slid off the bed, he kept whispering that she needed to die." *Appellant's Br*. at 31 (citing *Tr*. at 1301). That is, she acknowledges that Raymond slid off the bed to the floor. We do not find that the trial court's decision to admit Sergeant Weigel's testimony was reversible error.

## II. Consideration of Green's Proffered Mitigator

[43] Green argues that the trial court abused its discretion when it sentenced her by failing to consider evidence of domestic abuse. Sentencing decisions are within the discretion of the trial court and are reviewed on appeal for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. "An abuse of discretion occurs if the decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id*. (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)). A trial court may abuse its discretion (1) by failing to issue a sentencing statement or (2) by issuing a sentencing statement that bases a sentence on reasons that are not clearly supported by the record; omits reasons both advanced for consideration and clearly supported by the record; or includes reasons that are improper as a matter of law. *Id*. at 490-91.

[44] Here, Green argues that the trial court abused its discretion when it "refused" to recognize as a mitigating circumstance that she was a victim of domestic abuse

by Raymond. *Appellant's Br.* at 32. The trial court is not required to find mitigating factors, nor is it obligated to accept as mitigating each of the circumstances proffered by the defendant. *Ashby v. State*, 904 N.E.2d 361, 363 (Ind. Ct. App. 2009). The relative weight or value assignable to reasons properly found, or those that should have been found, is not subject to review for abuse of discretion. *Benefield v. State*, 904 N.E.2d 239, 247 (Ind. Ct. App. 2009), *trans. denied*.

[45] A trial court abuses its discretion in sentencing if it overlooks "substantial" mitigating factors that are "clearly supported by the record." *Anglemyer,* 868 N.E.2d at 491. The burden is on the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Corbett v. State*, 764 N.E.2d 622, 630 (Ind. 2002). In support of her position that the trial court failed to consider evidence of domestic abuse, Green argues that several witnesses testified to Raymond's dark, angry side. For instance, three witnesses, Mann, Gombos, and Green's brother, Todd Steinke ("Steinke"), testified that Green had shared that on one occasion Raymond grabbed Green's shirt and pushed her against a wall. *Tr.* at 868, 913, 928. Another witness, Frank Conway, testified that he saw Raymond express anger, in a situation unrelated to Green. A Florida mail carrier, Norma Jean Schneider ("Schneider") testified by deposition that on two or three occasions she saw what she believed was Green having a blackened right eye. She also saw Green have a splint on her finger more than once, and once Green told Schneider that the injury was the result of a horse injury. Schneider saw Green wearing an

arm sling on one occasion.  *Id*. at 1371, 1385.  She did not discuss the eye or arm injuries with Green or know how she received them.

[46]  The State maintains that it presented testimony of "numerous witnesses," which included friends and family, who contradicted Green's claims that Raymond was a violent, controlling, and abusive person and stated that Raymond was a gentle person, they never saw any signs of abuse, Green did not tell them of any abuse, and they did not see any injuries on Green's person. *Appellee's Br*. at 32 (citing testimony of Betty Green, Steinke, Gombos, Tami Kayworth, Jack Little, Robert Stevens, Richard Berg, and Laurelle Balog). Most described Green as smart, focused, pleasant but not warm, disciplined, and controlling of Raymond.  Based on the record before us, Green has failed to show that her alleged mitigating evidence is both significant and clearly supported by the record.

[47]  Green claims that, when sentencing her, the trial court "ignor[ed]" evidence showing Green was a victim of domestic violence. *Appellant's Br*. at 34; *Reply Br*. at 20.  In its sentencing order, the trial court expressly discussed Green's claims of domestic violence:

> UNPROVEN ALLEGATIONS OF DOMESTIC ABUSE
>
> The Court finds that defendant contended that the crime committed in this case was the result of domestic abuse perpetrated on her by the victim.  The Court finds that, in reviewing the record of these proceedings, no evidence was presented at trial to support a contention that the victim perpetrated domestic abuse on the defendant.  The Court finds

that some statements were made by the defendant to Dr. Karla Fischer (her opinions and testimony were excluded by the Court). The Court finds that these statements were not supported by any corroborating evidence and, due to flaws in the nature of Dr. Fischer's methodology, were not subject to testing for malingering to judge the credibility of Defendant's statements. (see Order Granting State's Motion in Limine to Exclude Testimony of Dr. Karla Fischer). The Court also notes that the defendant withdrew her defense under the "Effects of Battery" statute (Battered Woman Syndrome). *The Court finds no support for Defendant's allegations of abuse from witnesses called in this trial either by the State of Indiana or the Defense.*

*Appellant's App*. at 1412-13 (emphasis added).

[48] Although the trial court's discussion may have been in the context of addressing (and rejecting) Green's self-defense claim, and not in the context of mitigators and aggravators, it reflects the trial court's view that it found Green's claims that she suffered from domestic abuse to be not credible and not supported by evidence. Thereafter, after the above remarks concerning domestic abuse, the trial court addressed mitigating factors and recognized as a mitigator that Green had no criminal history, although its consideration was tempered by the fact that "her first criminal offense is a murder," which the trial court described elsewhere in its sentencing statement as "an execution." *Id*. at 1411, 1413. To the extent that Green's argument is that the trial court overlooked the domestic abuse mitigator, it did not. Rather, it addressed the domestic abuse claim and gave it no weight, and the relative weight or value assignable to reasons properly found is not subject to review for abuse of discretion. *Benefield*, 904

N.E.2d 247. We conclude that the trial court did not abuse its discretion when it did not find the claimed domestic abuse to be mitigating.

## III. Appropriateness of Sentence

[49] Green argues that her sixty-year sentence is inappropriate. "This court has authority to revise a sentence 'if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" *Delao v. State*, 940 N.E.2d 849, 853 (Ind. Ct. App. 2011) (quoting Ind. Appellate Rule 7(B)), *trans. denied*. "Although Indiana Appellate Rule 7(B) does not require us to be 'extremely' deferential to a trial court's sentencing decision, we still must give due consideration to that decision." *Patterson v. State*, 909 N.E.2d 1058, 1062-63 (Ind. Ct. App. 2009). As an initial guide to determining whether the sentence imposed was inappropriate, we assess the trial court's recognition or non-recognition of aggravators and mitigators. *Caraway v. State*, 977 N.E.2d 469, 472 (Ind. Ct. App. 2012), *trans. denied*. Under appropriateness review, the question is not whether another sentence would be more appropriate; rather, the question is whether the sentence imposed is inappropriate. *Williams v. State,* 997 N.E.2d 1154, 1165 (Ind. Ct. App. 2013). The defendant bears the burden of persuading this court that his sentence is inappropriate. *Caraway*, 977 N.E.2d at 472.

[50] Regarding the nature of the offense, the advisory sentence is the starting point the Indiana Legislature has selected as an appropriate sentence for the crime

committed. *Childress v. State*, 848 N.E.2d 1073, 1081 (Ind. 2006). Under Indiana Code section 35-50-2-3, a person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Green was sentenced to sixty years.

[51] As to the nature of the offense, Green shot Raymond five times, left the room, reloaded the revolver, and returned to shoot him an additional five times. She stuffed his body, along with scraps of bloodied carpet and other cleaning remnants, into a metal box, which she padlocked. The trial court noted the nature and frequency of Green's contacts with Mann, as well as her anger over the life insurance issue, and it found that the evidence established a "clear and deliberate intent to kill" Raymond, characterizing the death as "an execution." *Appellant's App*. at 1411. The nature of Green's offense does not warrant a revision of her sentence.

[52] Turning to her character, Green lied to friends, family, and police after Raymond's death concerning his whereabouts, claiming among other things, that their dog had killed Raymond. Then, after police located his body, she admitted to police that she had shot and killed Raymond, but she provided a version – that Raymond was out of bed and threatening to shoot Green – which the trial court found to be not consistent with the forensic evidence:

> [C]onclusive forensic evidence shows that the victim [] was in bed, under the sheet and comforter, when he was shot. No other reasonable explanation exists since all shots remained in the victim's body and shots were determined to have passed through the sheet and comforter prior to striking his body.

*Id.* at 1411 (emphasis in original). Green at no time exhibited remorse as she spoke to police and others. Green has not shown that her character warrants revision of her sentence. We do not find that her sixty-year sentence is inappropriate.

[53] Affirmed.

May, J., and Crone, J., concur.