## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2018, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen M. Heard
Vanderburgh County
Public Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Gerald Duane Lewis,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2018

Court of Appeals Case No.
18A-CR-1315

Appeal from the
Vanderburgh Circuit Court

The Honorable
Michael J. Cox, Magistrate

Trial Court Cause No.
82C01-1607-F1-4056

**Kirsch, Judge.**

[1]    Gerald Duane Lewis ("Lewis") appeals his thirty-six-year sentence following his guilty plea for Level 1 felony attempted murder.[1] On appeal, he raises the following restated issues:

> I. Whether the trial court abused its discretion when it did not recognize certain mitigating factors; and

> II. Whether, under Appellate Rule 7(B), Lewis's sentence is inappropriate in light of the nature of the offense and the character of the offender.

[2]    We affirm.[2]

## Facts and Procedural History[3]

[3]    Lewis did not know Crystal Cash ("Cash") but, on the afternoon of July 10, 2016, the two had a "random" encounter at the intersection of North First Avenue and West Columbia Street in Evansville, Vanderburgh County, Indiana. *Appellant's Conf. App. Vol. II* at 83. The two began to chat and Cash, who is a transgender woman, invited Lewis to come to the massage parlor that she ran out of an office building on North First Street, a location that also

---

[1] *See* Ind. Code §§ 35-42-1-1(1); 34-41-5-1.

[2] Responding to a request for restitution, the trial court also entered a $76,291.97 civil judgment in favor of the victim. Lewis does not appeal that judgment. *Tr. Vol. II* at 29.

[3] To establish the facts of this case, we, like the State, cite in part to the probable cause affidavit. *Appellant's. Conf. App. Vol. II* at 83-84. The probable cause affidavit was attached to the presentence investigation report and is also cited by Lewis in his appellant's brief. *Id*. at 83-84; *Appellant's Br*. at 8-10.

served as her personal residence. *Id.* Lewis wore combat boots and an "Israeli Christian" shirt with gold fringe and had tattoos on both of his arms. Later investigation revealed that Lewis was a member of a "black nationalist hate group" known as "Israel United in Christ." *Id.* at 43, 68. Initially, Lewis appeared to be "very nice," complementing Cash on her vehicle and asking her questions about herself and her job. *Id.* Once inside the office, Cash showed Lewis her business website. *Id.* at 84. Soon after, Lewis attempted to enter restricted areas of the office, which were closed off from the office; he also used the restroom. *Id.* Lewis seemed to be in the restroom for a long time, and when he came out, he had "turned into a monster." *Id.* Cash fled to her bedroom, but Lewis followed her, pulled out a gun, and shot Cash in the face, yelling "die, die faggot." *Id.* Cash pretended to be dead while Lewis stole all forms of her identification, including her passport, several credit cards and the keys to Cash's office. *Id.* Lewis then left.

[4] Cash called 911 and informed dispatch that she had been shot. When police and medical personnel arrived on the scene, they found Cash lying on the front steps of the office building with a gunshot wound on the left side of her face. *Id.* at 83. Cash had difficulty speaking and was unable to provide information to investigators. Police followed a trail of blood splatters into Cash's office and later, after obtaining a search warrant, found a "spent F.C. 9 mm Lugar shell casing" in Cash's bedroom. *Id.* at 83.

[5] Paramedics transported Cash to Deaconess Hospital in Evansville where she was treated for her wound. *Id.* Investigating officers attempted to speak with

Cash at the hospital, but she was intubated and unable to speak. *Id*. Through written communications, however, Cash was able to describe Lewis to police. That information enabled police to find Lewis and the gun he used to shoot Cash. Lewis had no permit for the gun. The police arrested Lewis.

[6] On July 13, 2016, the State charged Lewis with Level 1 felony attempted murder, Level 2 felony robbery resulting in serious bodily injury, and Class A misdemeanor carrying a handgun without a license. The advisory sentences for the Level 1 and Level 2 counts were thirty years and seventeen and a half years, respectively. The State also filed a sentence enhancement alleging that Lewis committed the underlying offense of attempted murder while using a firearm. In September 2016, at defense counsel's request, the trial court ordered Lewis to submit to a psychological examination to determine his competence to stand trial.

[7] Lewis was first examined by a psychologist, Dr. Frederick Nolen ("Dr. Nolen") on September 27, 2016. Dr. Nolen diagnosed Lewis with provisional dissociative identity disorder, major neurocognitive disorder, suspected child physical abuse, suspected child sexual abuse, post-traumatic stress disorder, and alcohol use disorder. *Id*. at 33. Dr. Nolen concluded that Lewis was not competent to stand trial at that time because his dissociative identity disorder and major neurocognitive disorder would make it impossible for him to mentally track the proceedings, understand their significance, and participate in his own defense. *Id*. at 33-34.

[8]     Lewis was examined by Dr. David Cerling ("Dr. Cerling") on October 14, 2016 and November 3, 2016. Dr. Cerling determined that Lewis was able to "identify the charges against him as including attempted murder, robbery, and having an unlicensed handgun." *Id.* at 40. Lewis told Dr. Cerling that he could not recall the incident leading to the charges and said that the incident as described to him was "totally inconsistent with his behavior." *Id.* at 41. While Dr. Cerling concluded that it appeared "likely that [Lewis] does have a significant mental illness," he stopped short of offering a diagnosis, noting "the defendant displayed no clear indications of a thought disorder." *Id.* at 42. Dr. Cerling observed that "the defendant is endorsing symptoms that are also quite atypical and inconsistent with psychotic disorders." *Id.* Dr. Cerling concluded, "It appears highly probable . . . that [Lewis] has an age-appropriate factual and rational understanding of court principles and procedures relevant to the charges he is facing in court. He understands the basis of the charges against him, although he states he has no recollection of the reported incident." *Id.*

[9]     Lewis filed a request for a sanity evaluation. The trial court granted the request and ordered Lewis to undergo a sanity evaluation with Dr. Cerling. Following his additional assessments and interview of Lewis, Dr. Cerling reiterated that Lewis was "overreporting symptoms" and stated that he was unable to issue a definitive diagnosis. *Id.* at 44. Dr. Cerling wrote, "In light of potential overreporting of symptoms as well as reported amnesia for the events, any definitive opinion regarding his ability to perceive wrongfulness at the time of the event cannot be reached." *Id.* at 44. In March 2017, the trial court

determined that Lewis was not competent to stand trial and temporarily stayed the proceedings. *Id*. at 45. Lewis was then transported to the Logansport State Hospital where he received inpatient mental health treatment. *Id*. at 72.

[10] On September 27, 2017, psychologist Dr. Megan O'Grady (Dr. O'Grady") examined Lewis and issued a report finding that Lewis was competent to stand trial. *Id*. at 72. Dr. O'Grady reported that Lewis did not appear to meet the criteria for the "previous diagnoses [by Dr. Nolen] of Dissociative Identity Disorder, Major Neurocognitive Disorder Due to TBI, and Posttraumatic Stress Disorder. *Id*. at 77. She also concluded that a more precise diagnosis was not possible because, "[w]hile hallucinations and delusions are typical features of Schizophrenia, there are a number of factors that do argue against such a diagnosis, such as the discrepancy between [Lewis's] self-report and observations by others, a course of illness that is inconsistent with that which is typically seen in Schizophrenia, and multiple recent test scores suggesting exaggeration of symptoms." *Id*.

[11] On October 5, 2017, after the trial court determined that Lewis was competent to stand trial, he was transported to the Vanderburgh County Jail. On February 14, 2018, Lewis pleaded guilty to Level 1 felony attempted murder, and the State agreed to dismiss the remaining two counts and the sentencing enhancement. The plea agreement was open regarding sentencing but contained the question, "Are you aware that the maximum possible sentence in this case is 40 years and the minimum possible sentence is 20 years with a

possible fine of up to $10,000?" *Appellant's Conf. App. Vol. II* at 63. Lewis marked "yes" to this question and signed the plea agreement. *Id.*

[12]     The trial court accepted Lewis's plea. A sentencing hearing was held in May 2018, during which the trial court considered Lewis's PSI, a letter filed by Cash, comments of Lewis, and reports of the psychologists who had performed the mental health evaluations. At the close of arguments, the trial court made the following sentencing statement:

> Upon that conviction, the Court does note that there are mitigating and aggravating factors. The Court does acknowledge that the *defendant has no criminal history*, and that *he has expressed his remorse and accepted his responsibility*; however, the Court does not find that the crime occurred under circumstances unlikely to reoccur, nor does the Court find that the defendant acted under strong provocation. I don't know, and I don't know that anyone here in the Courtroom knows, why the defendant acted as he did, but the result of his actions are that we have a victim who has been significantly harmed and injured, and the injury and harm to the victim are much greater than the elements necessary to prove the commission of the offense. What amounts to a completely unprovoked shooting of the victim in the face, which resulted in the victim losing much of the use of her bone and muscles in her face, and that has caused innumerable issues for the victim just to chew her food or to speak, among other things. The Court does not find any grounds tending to excuse or justify this crime but, again, the Court did consider the defendant is *pleading guilty*, and thereby saving the State valuable time and resources. *The Court finds the aggravating circumstances do outweigh the mitigating*, and the Court now sentences [Lewis] in Count I to the Indiana Department of Correction for a period of thirty-six (36) years, that sentence is to be served executed.

*Sentencing Tr*. at 25-26 (emphasis added).  Lewis now appeals his sentence.

# Discussion and Decision

## I. Mitigating Factors

Lewis contends that the trial court abused its discretion during sentencing when it did not consider certain mitigating circumstances.  Sentencing decisions rest within the sound discretion of the trial court and are reviewed only for an abuse of discretion.  *Green v. State*, 65 N.E.3d 620, 635 (Ind. Ct. App. 2016) (citing *Anglemyer v. State,* 868 N.E.2d 482, 490 (Ind. 2007)), *trans. denied* (2017).  "An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom."  *Id*. at 635-36 (quoting *Anglemyer*, 868 N.E.2d at 490).  A trial court may be found to have abused its sentencing discretion by: (1) failing to enter a sentencing statement; (2) entering a sentencing statement that cites reasons unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record and that were advanced by the defendant; and (4) entering a sentencing statement in which the reasons given are improper as a matter of law.  *Id*. at 636.

On appeal, Lewis claims that the trial court abused its discretion during sentencing when it did not give sufficient consideration to Lewis's:  (1) lack of criminal history; (2) decision to plead guilty; and (3) expression of remorse.  *Appellant's Br*. at 13-14.  He also contends that the trial court abused its

discretion when it "did not even mention Lewis's mental illness" as a mitigating circumstance. *Id*. at 12.

[15] The trial court is not required to find mitigating factors, nor is it obligated to accept as mitigating each of the circumstances proffered by the defendant." *Green*, 65 N.E.3d at 636. "The relative weight or value assignable to reasons properly found, or those that should have been found, is not subject to review for abuse of discretion." *Id*. A trial court abuses its discretion in sentencing if it overlooks "substantial" mitigating factors that are "clearly supported by the record." *Id*. (citing *Anglemyer,* 868 N.E.2d at 491). The burden is on the defendant to establish that the mitigating evidence is both significant and clearly supported by the record. *Id*.

[16] We disagree with Lewis's contention that the trial court did not give sufficient consideration to his: (1) lack of criminal history; (2) decision to plead guilty; and (3) expression of remorse as mitigating circumstances. At the close of the sentencing hearing, the trial court specifically identified these three mitigating circumstances, discussed aggravating circumstances, and specifically found that the "aggravating circumstances *do outweigh* the mitigating" circumstances. *Sentencing Tr*. at 26 (emphasis added). We may not consider whether a trial court abused its discretion when it determined the relative weight or value assignable to reasons properly found, or those that should have been found. *See Green*, 65 N.E.3d at 636. We find no abuse of discretion regarding these three factors.

[17] Likewise, we find no abuse of discretion regarding the trial court's handling of Lewis's mental health history. Lewis argues that the trial court abused its discretion when it "did not even mention Lewis's mental illness" as a mitigating circumstance. *Appellant's Br.* at 12. Three psychologists examined Lewis during the State's investigation and prosecution. Dr. Cerling reported that Lewis's "responses on the M-FAST and the SIMS reflect a pattern of reporting symptomatology that is inconsistent with typical presentations for a psychotic disorder, an affective disorder, or some type of neurologic impairment, such as amnesia." *Appellant's Conf. App. Vol. II* at 41. Doctors Cerling and O'Grady determined that Lewis had overreported his symptoms, and therefore, they were unable to conclusively diagnose Lewis's condition or conditions. *Id.* at 44. The only nexus presented to show a connection between Lewis's mental illness and his having committed attempted murder was presented by defense counsel when, during the sentencing hearing, he said that Lewis's attack was triggered by sexual contact with Cash. *Tr. Vol. II* at 19. This statement, however, is mere conjecture, and Lewis provided no evidence to substantiate that claim. *Id.* at 18-19. The evidence does not establish that Lewis's history of mental illness was in any way connected to his decision to attack Cash.

[18] The trial court was well aware of Lewis's mental health history and ordered numerous mental health evaluations of Lewis to determine whether he knew what he was doing when he committed the crime and whether he was competent to stand trial. A "trial court is not required to find mitigating factors, nor is it obligated to accept as mitigating each of the circumstances proffered by

the defendant." *Green*, 65 N.E.3d at 636. The trial court did not abuse its discretion in its consideration of mitigating circumstances.

## II. Inappropriate Sentence

[19] Lewis also contends that his thirty-six-year executed sentence is inappropriate. Pursuant to Indiana Appellate Rule 7(B), this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the [c]ourt finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Our Supreme Court has explained that the principal role of appellate review should be to attempt to leaven the outliers, "not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008); *Yoakum v. State*, 95 N.E.3d 169, 176 (Ind. Ct. App. 2018), *trans. denied.* We independently examine the nature of Lewis's offense and his character under Appellate Rule 7(B) with substantial deference to the trial court. *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015). "[W]e do not look to see whether the defendant's sentence is appropriate or if another sentence might be *more* appropriate; rather, the test is whether the sentence is 'inappropriate.'" *Barker v. State*, 994 N.E.2d 306, 315 (Ind. Ct. App. 2013), *trans. denied*. Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224. Lewis bears the burden of persuading us that his sentence is inappropriate in light of the nature of the offense and his character. *Id.*

[20] "The nature of the offense is found in the details and circumstances of the commission of the offense and the defendant's participation." *Croy v. State*, 953 N.E.2d 660, 664 (Ind. Ct. App. 2011). Lewis admits that "[t]here is no doubt that the nature of the offense is very serious" and that "[t]he crime of attempted murder is extreme." *Appellant's Br*. at 15. The Indiana General Assembly recognized these factors when it established a sentencing range of twenty to forty years with an advisory sentence of thirty years. *Id*. Lewis contends that he "is not arguing that the offense is not serious but rather that thirty-six years, which is six years over the advisory, is inappropriate. *Id*. We are not persuaded.

[21] Lewis pleaded guilty to attempted murder under the following circumstances. Lewis randomly met Cash on the street, the two chatted in a friendly way, and Lewis went willingly with Cash to her office building, which also served as her home. Lewis used the restroom. Cash said that Lewis seemed to be in the restroom for a long time, and that when he came out, he had "turned into a monster." *Appellant's Conf. App. Vol. II* at 84. Cash fled to her bedroom, but Lewis followed her, pulled out a gun, and shot Cash in the face, yelling "die, die faggot." *Id*. Lewis left Cash for dead while he stole all forms of ID, including her passport, several credit cards and the keys to Cash's office. *Id*.

[22] Cash was the victim of an unprovoked shooting. *Sentencing Tr*. at 84-85. She was hospitalized for about one month, underwent two emergency surgeries, had a complete blood transfusion, had her jaws wired shut, was placed on a breathing machine, and had a feeding tube inserted into her abdomen.

*Appellant's Conf. App. Vol. II* at 99.  Cash suffered lasting physical damage including partial loss of her tongue, jaw bone and teeth, nerve damage, and pain.  *Id.*  She has developed a speech impediment and has a small hole in the left side of her face that, as of the sentencing hearing, had not healed.  *Id.* Lewis's actions resulted in a "victim who has been significantly harmed and injured, and the injury and harm to the victim are much greater than the elements necessary to prove the commission of the offense."  *Id.* at 84.  The nature of the offense does not warrant a revision of Lewis's sentence.

[23]  Regarding his character, Lewis contends that his sentence is inappropriate because he suffers from mental health issues, has no criminal history, showed remorse, and pleaded guilty.  The State counters that whatever good character Lewis has is outweighed by his membership in "Israel United in Christ," a "black nationalist hate group."  *Id.* at 43, 68.  When Lewis shot Cash, he shouted, "die, die faggot."  *Id.* at 13.  Lewis wanted to kill Cash.  *Id.* at 83. During the sentencing hearing, Lewis told the trial court that he had no knowledge of Cash's gender identity when he shot her and said that his use of the word "faggot" was "just an exaggeration."  *Sentencing Tr.* at 25.  However, defense counsel admitted that Lewis's membership in "Israel United in Christ" may have played a role in the shooting, saying, "Perhaps the teachings of that group planted a seed, a negative seed, toward transgendered individuals in my client's brain, but his actions were not at the direction or involved with that group at all."  *Id.* at 21.  Furthermore, Lewis's use of the homophobic slur suggests that he had knowledge of Cash's sexual and gender identities at the

time of the shooting. The record establishes that Lewis committed a targeted act of violence. We do not believe that Lewis's character warrants a revision of his sentence.

[24] Our task on appeal is not to determine whether another sentence might be more appropriate; rather, the inquiry is whether the imposed sentence is inappropriate. *Barker*, 994 N.E.2d at 315. Lewis has failed to carry his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

[25] Affirmed.

Riley, J., and Robb, J., concur.